[Crim. No. 3311.   First Dist., Div. One.   Sept. 30, 1957.]

THE PEOPLE, Respondent, v. SANFORD P. BRYANT, Appellant.

Carl B. Shapiro for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant appeals from conviction after jury trial of violation of section 245, Penal Code (assault with a deadly weapon) contending (1) that misconduct of the assistant district attorney deprived him of a fair trial, and (2) that section 3024 (possession of gun by a person previously convicted of a felony) cannot be applied in the case of a conviction under section 245.

### EVIDENCE

Elbert Fasen, the victim and a member of the United States Air Force, was, on December 30, 1955, driving his 1953

Mercury two-door sedan in the city of Oakland. He and another airman, M. C. Wilder, picked up Betty and Elouise at a beauty shop and then went riding around. Elouise was in the left rear seat and Betty in the right front seat. As Fasen turned off Market Street into 8th Street, he noticed another car immediately behind, which pulled ahead of Fasen's car and stopped, and then Fasen stopped his car. Four or five men emerged from the other car, came back to his car, and one of them said, "Man, open your door." Fasen identified that man to be defendant. Defendant opened the door of Fasen's car, and Fasen noticed that defendant had a gun in his right hand which he fired. Fasen felt a jar and started to get out, but defendant pointed the gun in his face and said, "Don't get out." Defendant reached into the car and pulled Elouise out with his left hand. He took her to the other car. Betty also went with defendant at his order. Then they, defendant and his group, drove off. After defendant drove away in his car, Fasen got out of his car, feeling blood in the area of his buttocks. He then drove to the Armed Service Police, and subsequently received treatment at Oak Knoll Naval Hospital.

Fasen recounted a casual meeting with defendant at Jimmy's Barbecue, a restaurant in Oakland, after his treatment. There appellant came over to him and said, "Man, I'm sorry. . . . I know there is nothing to say when you shoot someone, but I'm still sorry."

Betty testified she was riding in Fasen's Mercury on the evening of December 30th, at approximately 11:30 p. m. She testified essentially to the same facts as Fasen except that Fasen had picked up the two girls at her house by prearranged plan, that only three men got out of the car, and that she did not see any gun in defendant's hand.

M. C. Wilder testified that he was riding around Oakland with Fasen and the two girls on December 30th. Fasen's car was stopped by another car. Four men got out, approaching Fasen's car, two on each side. One of the men said, "Get out." He heard a shot after the door on the driver's side had been opened. Defendant was standing at the door of the driver's side with a gun in his left hand. Both girls got out of the car and entered the other automobile which drove away. He took Fasen downtown where they met a patrol car and Fasen was taken to the hospital.

Inspector Page was told by defendant, approximately a

week after the shooting, that Fasen had the gun and in a struggle it went off.

A police stenographer testified to an interview with defendant conducted by Police Lieutenant Murray in which defendant stated that on the night in question a friend called at his house inquiring about a certain girl; that defendant and this friend went looking for the girl; that they saw Fasen on the corner of 7th and Market Streets, and parked their car in front of his; that he, defendant, went over to the driver's side of the car and told Fasen that one of his passengers was his friend's girl friend; that Fasen told defendant, "Well, punk, you got nothing to do with it; it's none of your business"; that defendant grabbed Fasen and started to pull him off the seat, but Fasen had a gun in his hand; that defendant grabbed his hand and pushed him down; that the gun went off; that the defendant hit Fasen's hand and twisted it causing Fasen to drop the pistol to the floor; that defendant pulled Fasen out of the car; that the girls got out of Fasen's car and entered his friend's car.

Approximately five months after the shooting police officers, armed with a search warrant, went to apartment one at a certain address in Oakland. Searching a chest of drawers therein which contained mostly baby clothes, they found a loaded .38 caliber revolver, and also a large number of .38 caliber cartridges. In a man's coat in a closet which contained mostly men's clothing, more of the same caliber cartridges were found. About three hours later, four people entered the apartment, Elouise, a Filipino named Hipol, and defendant, carrying a baby. Defendant was then arrested. When queried as to who owned the revolver he said he did not know. Elouise also stated that she did not know its ownership. In defendant's pocket were keys, one of which was for the outside door to the building and a second was for the door to the apartment. Elouise stated that the men's garments in the closet belonged to defendant. The next day Elouise asked for the return of the gun. Ballistic tests showed that this revolver fired the bullet extracted from Fasen's body.

Elouise came valiantly to defendant's rescue. She testified that on the night in question, Betty and she were in the car with Fasen and Wilder; that her former boy friend, Bennett, had asked her to keep for him a gun which was in a paper bag. Not wearing a coat she put the gun in a pocket of her pedal pushers, taking it with her when she got in Fasen's car. As they were proceeding Fasen said that another car

was going to run into them. Fasen pulled over and stopped. Three people got out of the other car, one of whom was defendant and another one Willis. Defendant was standing at the side of the driver's door and said, "Open the door." Wilder told Fasen, "Don't open the door; just roll the glass down." The window was already down. Defendant stated, "Open the door, get out the car, Elouise; your mother has been looking all over for you; she is worried about you; you better go home to your baby." Wilder told Elouise not to get out of the car, holding onto her right hand. The defendant said to Wilder, "You let her out of the car, man . . . You don't have anything to do with that, man, let her out." Wilder said, "Well, she don't have to get out unless she wants to." The two of them started to pull on her arms, causing the gun to slip out of her pocket. She picked it up and it went off. Defendant put the two girls in his car and took them home. At that time, Elouise was living at 7728 Rugsdale. She put the gun in the basement where it remained until April, at which time she moved to 693 39th Street, where she kept the gun in the drawer with the baby's clothes.

Elouise admitted telling the officers at the apartment that she did not know anything about the gun and that one Brown had left some bullets on the floor that morning. She denied requesting the return of the gun. She said she told the officers defendant did not own it. She said that they asked her if she had shot Fasen. She said "I am not telling you Yes and I am not telling you No." She said defendant kept some of his clothes in her apartment. Letha, a friend of Elouise's, testified that when she asked the latter about the gun in her apartment, Elouise said that she had accidentally shot someone on 7th Street.

In spite of defendant's earnest contention that the evidence was close, particularly because of the testimony of Elouise, there can be no question of defendant's guilt.

Defendant's version was that with one Owens, he set out to find Elouise. When they saw Fasen's car with the girls in it, they followed. When Fasen parked, defendant pulled in front. Owens and he approached the other car. Defendant asked Fasen to open the door. There was no reply. Defendant opened the door and told Elouise she was wanted at home. Wilder told defendant they would take her home. Defendant grabbed Elouise by one arm. Wilder grabbed her by the other. In the course of the struggle, Elouise, getting her arm free from Wilder, reached for something on the floor. Wilder

grabbed the arm again and there was an explosion. Fasen stated that he had hurt his right hand. Both of the girls got into defendant's automobile, whereupon he drove them home. At the time of his arrest defendant asked Sergeant Hilliard why he was being arrested. Hilliard replied "For possession of narcotics." Defendant told Hilliard he knew nothing about the pistol found in Elouise's apartment. He admitted he lied to the police in stating that Fasen had the gun. He did it to protect Elouise.

The Naval Hospital Medical Officer testified to removing a bullet from Fasen's buttocks and that from the course the bullet followed it must have been fired from an angle of about 30 degrees up from the horizontal and approximately 30 degrees from the lateral axis of Fasen's body to the rear. The bullet entered the left buttocks and was found in the right. This testimony made Elouise's version of the shooting highly improbable.

1. *Alleged Misconduct.*

■ Defendant's charge of misconduct on the part of the assistant district attorney deals mainly with references to narcotics. Defendant concludes from the fact that apparently no question of narcotics was raised in a previous trial in which the jury disagreed, and that narcotics was mentioned in this trial, that the latter fact was the cause of his conviction. There is nothing in the record to show whether or not his statement concerning the evidence at the prior trial is correct. Assuming it to be correct, however, admittedly there is a very significant difference in the evidence at the two trials. At the time of the prior trial the gun had not been found. At the second trial it was found in the apartment to which defendant had the keys, and where he kept clothing, and cartridges fitting it were found in the pocket of one of his coats. Moreover, as will be pointed out, the mention of narcotics was due to defendant as much as to the prosecution, was a minor incident of the trial, and could not possibly have affected the verdict.

Concerning the search of defendant's apartment, Officer Reed, without objection, testified that his specific duty as a member of the Special Services Detail of the Oakland Police Department was enforcement of the narcotic laws and that two other officers of the Special Services Detail of that department and Special Agent McBee of the State Narcotic Bureau were present. On cross-examination defendant asked Reed why as a member of the Special Services squad he was "even remotely interested" in to whom the gun found in the apart-

ment belonged. Reed replied that actually he was not so interested, that his mission at the apartment was to search for narcotics, and he merely happened to find the gun. He was then asked if he found any narcotics and stated he did not, only "paraphernalia." On redirect the prosecution asked "What kind of paraphernalia . . ." Defendant objected. The question was withdrawn. No assignment of misconduct or request for an admonition was made. On the redirect examination of Sergeant Hilliard, the latter was asked without objection a question concerning what defendant had said about having the charge against him reduced to battery. Hilliard said, "Well, after I arrested Mr. Bryant for narcotics" he went to Lieutenant Murray and told him concerning the battery conversation. No request to strike the statement nor to admonish the jury was made. The subject of narcotics was not relevant but the mention of it was incidental and a reading of the entire transcript shows no intention of the prosecution to emphasize it. While it should not have been mentioned, we can find no prejudicial misconduct in connection with it. Apparently defendant, at the time, did not feel it to be prejudicial because he at no time called the court's attention to it.

■ The same is true as to the reference to Rudolph Hipol. Officer Reed in testifying to the persons who came to the apartment with defendant, stated that one was a Filipino named Rudolph Hipol whom the police called "Happy." Obviously, this was merely descriptive. Defendant's witness Elouise in referring to this same person called him "Joyful." Defendant now contends that mentioning that Hipol was a Filipino constituted prejudice. However, defense counsel at the trial apparently did not think it so for in examining Elouise he asked her if "Joyful" was a man of Filipino extraction. We see no prejudice either in the fact of Hipol's race or his nickname. There was nothing here to inflame the jury as was the situation in *People* v. *Simon,* 80 Cal.App. 675 [252 P. 758], relied upon by defendant. ■ Several questions asked by the prosecution should not have been asked. Elouise testified that Hipol came to the apartment with her and defendant to pick up a chair to be upholstered and that he was an upholsterer. On cross-examination plaintiff asked if she knew that Hipol was a narcotic addict. She replied that she did not. She was then asked in effect if she did not know whether he was an addict because she had never seen him take

a shot. No objections were made to these questions. While they should not have been asked, they were not prejudicial.

Elouise was asked by the prosecution what was on the mantel when she came in to the apartment. She stated the gun, some bullets and "some capsules." She was then asked if there was an "outfit" there, and if she knew what an "outfit" was. She testified that she could not remember if there was one there and that Sergeant Hilliard had explained to her what an "outfit" was. She then stated that Letha's husband owned some hypodermic needles which he left in the apartment, that he used insulin. Then a discussion arose between court and counsel as to whether the hypodermic was included in People's Exhibit 7 which were the objects in an envelope which had been admitted in evidence as being found in the apartment. At no time during the discussion was any objection made either to the questions or to the admission of the hypodermic. However, the court ruled that the latter had not been admitted in evidence. Then counsel for defendant stated that until now no one knew what was in the envelope and "This is the first time any of us had an idea what was in it. *It is all right.*" (Emphasis added.) Counsel for plaintiff: "If it isn't all right, I will stipulate it can be withdrawn from evidence." Counsel for defendant: "I just said, let me see them. You said they are in evidence and that surprised me. I don't see what they had to do with this case, *but that is all right.*" (Emphasis added.) Nothing further was said concerning the hypodermic. Under these circumstances there was no prejudice.

Defendant was charged with and admitted prior felonies,— robbery and kidnapping and automobile theft. Defendant contends that because of this admission, the assistant district attorney was guilty of misconduct in bringing out the fact of these convictions on cross-examination. There is no merit to this contention. ▪▪ It has been repeatedly held that a defendant who admits prior felonies may nevertheless be impeached on cross-examination by showing such convictions. (*People* v. *Raquel*, 125 Cal.App.2d 384 [270 P.2d 528].)

▪▪ On cross-examination defendant was asked if he knew that it was a felony for an ex-convict to have a gun in his possession. Defendant said he did. The only objection to this question was that it called for defendant's conclusion. The court allowed the question as bearing on defendant's state of mind. This was proper. Defendant had stated to the police that Fasen had the gun. When it was found, it was obvious

that that statement could not stand. Then he said it was in Elouise's possession. The fact that he knew it to be a felony for him to possess it could be considered by the jury as a reason for his claiming that Elouise had it.

■ The assistant district attorney referred to defendant as an ex-convict. In most instances in doing so he was commenting upon the fact that an ex-convict caught with a gun would have an inducement to lie about its possession because the law made such possession a felony. This was fair comment. ■ However, in one instance he exceeded the bounds of propriety when he said, referring to defendant, "I hate him because he is an ex-con." Under the facts of this case we cannot say that such statement was prejudicial. There can be no doubt that in the absence of such a statement defendant would have been convicted. See *People* v. *Ramirez*, 143 Cal. App.2d 554 [300 P.2d 106], where the characterization of the defendants by the prosecutor because of prior convictions was much more serious than the one here, and yet the court held the misconduct not to be prejudicial.

■ On cross-examination the prosecutor without objection brought out that defendant was a professional fighter, and had won all of his fights the previous year. He then asked him if he was licensed to fight during the current year. Defendant replied that he was not. While this evidence was immaterial, it was not objected to and could not have prejudiced defendant.

We have examined the other assignments of misconduct based upon reflections seemed to be cast upon defense counsel during argument. None of them are serious nor was any objection made to them. While they would have been better left unsaid, we are convinced that they were in nowise prejudicial.

Defendant gives four instances of "Testimony by question and by speculation." We find nothing improper in them. ■ As to only one of them was objection made. That was when defendant was asked if he could explain the fact that six cartridges were found in his coat. Defendant objected on the ground that it called for defendant's conclusion. There was no misconduct in asking this question.

## 2. *Does Section 3024 Apply?*

The information charged defendant with violation of section 245 (assault with a deadly weapon). It also charged that at the time of the commission of the offense, he was armed

with a deadly weapon, to wit, a revolver. The jury's verdict found defendant guilty as charged and additionally found that he was armed with a deadly weapon at the time. The judgment stated defendant's conviction of the substantive offense and also his possession of a deadly weapon at the time of the commission of the offense within the meaning of section 3024, Penal Code. The judgment sentenced defendant to the state prison for "the term provided by law."

Section 3024 heretofore provided that the minimum term of sentence and imprisonment for a crime committed by a person armed with a deadly weapon who has been previously convicted of a felony shall be 10 years. The punishment provided by section 245 for an assault with a deadly weapon is imprisonment in the state prison not exceeding 10 years or in a county jail not exceeding one year, or by a fine not exceeding $5,000 or by both such fine and imprisonment.

■ The question here is whether, the Legislature having theretofore fixed a certain penalty for a crime that can only be committed with a deadly weapon, it intended section 3024 should apply, making a higher penalty, or whether section 3024 can only be applied in the case of a crime which can be committed without the use of a deadly weapon but such a weapon is present. This very question has been answered favorably to defendant's contention in *In re Shull,* 23 Cal.2d 745 [146 P.2d 417]. There the defendant was convicted of assault with a deadly weapon, a pistol. The jury found that he had suffered two prior felony convictions and was armed with a deadly weapon at the time of the commission of the substantive offense. The Board of Prison Terms and Paroles, in fixing the defendant's term of imprisonment, applied the then section 1168, subdivision 2, of the Penal Code (now section 3024) and fixed additional penalty to that provided for by section 245. The Supreme Court held that this constituted double punishment and jeopardy because the integral part of both assault with a deadly weapon and being armed with such weapon when the felony is committed is the same, and that the additional penalty does not apply in a case where the basic offense requires use of a deadly weapon. It said (p. 751): "Briefly, the Legislature has fixed the punishment for an assault where a deadly weapon is used, a particular crime, and it is not to be supposed that for the same offense without any additional factor existing the added punishment should be imposed. In felonies where a deadly weapon is not a factor in the offense, the additional punish-

ment is imposed by section 3 of the Deadly Weapons Act, because of the additional factor of a deadly weapon being involved." The additional penalty was held to be improperly imposed. See also *In re Rodgers*, 121 Cal.App. 370 [9 P.2d 223], holding that the additional penalty could not be imposed upon an ex-convict found guilty of violating section 2 of chapter 339, Statutes of 1923, which makes it a felony for an ex-convict to have a firearm in his possession.

The inclusion in the judgment of the statement "Defendant was armed with a deadly weapon at the time of his commission of the offense, or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code Section 3024," was improper. Accordingly the judgment should be and hereby is corrected by deleting the above recital. (See *People v. Calloway*, 127 Cal.App.2d 504 [274 P.2d 497]; *People v. Lesterjette*, 40 Cal.App.2d 327 [104 P.2d 844].) In all other respects the judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied October 30, 1957, and appellant's petition for a hearing by the Supreme Court was denied November 26, 1957.