[Crim. No. 158.   Fifth Dist.   Dec. 28, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN WAYNE THOMSEN, Defendant and Appellant.

John Wayne Thomsen, in pro. per., and James S. Shepard, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and David L. Kelly, Deputy Attorneys General, for Plaintiff and Respondent.

STONE, J.—Defendant appeals from a judgment entered by the court following a trial without a jury, of violation of section 211a of the Penal Code, armed robbery, count one, and violation of section 182 of the Penal Code, conspiracy to commit armed robbery, count two.

The San Francisco police were told by an informer, telephoning from British Columbia, that defendant, who could be located at the Del Webb Motel, San Francisco, had committed or was about to commit an armed robbery. The call came during the night, and the police placed defendant's room under surveillance until 8 :30 a.m. when two inspectors had a maid open the door and admit them. They placed defendant under arrest, searched him and found a car rental contract with Hertz Fresno agency, and a key to a Mercury automobile. They used the key to open the automobile, which bore a British Columbia license plate and was parked at the motel, and found a box of ammunition. Because defendant gave varying accounts of his recent activities and the car rental agreement was for a Thunderbird automobile while defendant was driving a Mercury, the San Francisco police called the Fresno police to see if defendant was wanted.

In the meantime, Fresno police learned that two persons apprehended in the act of robbing a jewelry store in downtown Fresno, apparently had an accomplice. One of the robbers told the police that later on when the time was right he would tell them who it was. A book of matches found in the possession of one of the robbers advertised a Fresno motel. By checking there, the police obtained a description of defendant and his Mercury automobile. In a suitcase left in the room occupied by defendant and delivered to the police by the motel manager, the police found a shirt with the name ''J. Thomsen'' on it and doubted that defendant's true name was ''R. Passage'' as he had signed the registration card.

Consequently, when the San Francisco police called, the Fresno police told them a man answering defendant's description and driving a Mercury automobile bearing a British Columbia license was suspected of having taken part in a jewelry store robbery. At the request of Fresno police, the San Francisco police booked defendant at the San Francisco Jail as ''en route'' to Fresno. They again searched defendant and in a pocket of his clothing found a diagram of a floorplan on the back of letter paper. When the Fresno officers arrived a few hours later they were given the automobile key, the box of ammunition, the car rental contract, and the diagram. The officers first took defendant to the Del Webb Motel and with defendant's consent paid his bill with his money, picked up his luggage and transported him and his belongings to Fresno.

During the return trip the policemen asked defendant some questions about his being in Fresno, his activities while there, and about his companions who were arrested in the act of robbing the jewelry store. He told the police he had abandoned his traveling companions when he learned they were drug addicts. Upon arrival in Fresno, defendant was taken to police headquarters and questioned by two deputy district attorneys before being ''booked'' at the county jail.

At the time the Fresno police took defendant to the Del Webb Motel en route to Fresno, they obtained a sack of defendant's clothing from a bellman. Some six days after defendant's arrest and five days after his arraignment, a Fresno police officer searched defendant's clothing and found a Vancouver, British Columbia, motor hotel letterhead upon which was written: ''Fresno. Main drag. Thistlewaite & Swift.'' The name of the robbed jewelry store was Thistlethwaite & Shields, located on the downtown mall. Although defendant was represented by counsel, the officer interrogated him about the note without securing counsel's consent.

All of the People's evidence, both physical and oral, was received subject to defendant's continuing objection upon the ground his arrest by San Francisco police was unlawful and the evidence used against him stemmed from that unlawful arrest. At the conclusion of the People's case, the court ruled that the original arrest by San Francisco police and the search pursuant thereto were illegal, but that the subsequent arrest at the request of Fresno police was legal. Although the court made no order striking evidence obtained as a result of

the unlawful arrest, we must presume that since the case was tried without a jury the court did not consider the evidence it ruled was illegally obtained.

Defendant argues that the court erred in holding valid the second arrest at the request of Fresno police, since it resulted from the copy of the Hertz Car Rental Agreement admittedly seized illegally by the San Francisco police. However, the Fresno police, by an independent investigation, uncovered evidence that pointed to defendant as an accomplice. Not only did Jackson, one of the robbers, tell the Fresno police a third person was involved, and hand them the keys to the Mercury which he said the third person would pick up, but a book of matches found on Jackson's person directed the officers to a motel. There they learned that three persons whose descriptions fitted the two robbers and defendant, had occupied adjoining rooms, that a man with a Mercury bearing a British Columbia license registered on behalf of them and signed the card "R. Passage." The police learned that all three checked out the morning of the robbery and "R. Passage" paid the bill. The maid who made up the rooms after they had checked out discovered some bobby pins, pennies, personal odds and ends, and a suitcase. She put everything in the suitcase and took it to the "lost and found" room. The manager gave Fresno police permission to examine the contents, among which they found a shirt with defendant's name on it. Through these investigatory leads the attention of Fresno police was focused on defendant as the third person involved in the robbery.

We observe, parenthetically, that the search of the suitcase was not illegal, as defendant contends. Defendant and his two companions had checked out of the motel and abandoned the suitcase; it was legally in the custody of the motel manager as "lost and found" property. In *Abel* v. *United States*, 362 U.S. 217, the court said, at page 241 [80 S.Ct. 683, 4 L.Ed.2d 668]: "These two items were found by an agent of the F.B.I. in the course of a search he undertook of petitioner's hotel room, immediately after petitioner had paid his bill and vacated the room. They were found in the room's wastepaper basket, where petitioner had put them while packing his belongings and preparing to leave. No pretense is made that this search by the F.B.I. was for any purpose other than to gather evidence of crime, that is, evidence of petitioner's espionage. As such, however, it was

entirely lawful, although undertaken without a warrant. This is so for the reason that at the time of the search petitioner had vacated the room. The hotel then had the exclusive right to its possession, and the hotel management freely gave its consent that the search be made.'' (See also *People* v. *Crayton,* 174 Cal.App.2d 267, 269 [344 P.2d 627].)

This independent investigation by Fresno police pointed to defendant; that he was being detained illegally by the San Francisco police did not diminish the probable cause for his subsequent arrest while still in custody. To hold otherwise would unduly hamper law enforcement without achieving any useful purpose.

The use of evidence obtained by the San Francisco police presents a different question. The fact defendant had actually committed a felony did not justify the illegal arrest and search. (*People* v. *Brown,* 45 Cal.2d 640 [290 P.2d 528].) Therefore the question is whether the illegally-seized evidence was the matrix of the legally-obtained evidence and the connection between the two classes was so strong that a reversal is compelled.

■ Since the court held the original San Francisco arrest and seizure of evidence illegal, the first question is whether use of the illegally-seized copy of the Hertz Car Rental Agreement so permeated the proof against defendant that his conviction stemmed from ''tainted'' evidence. (*Silverthorne Lumber Co.* v. *United States,* 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426]; *Wong Sun* v. *United States,* 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441]; *People* v. *Bilderbach,* 62 Cal.2d 757 [44 Cal.Rptr. 313, 401 P.2d 921].) We think not. In the first place, the investigation made by Fresno police before receiving the telephone call pointed to defendant as a suspect. This evidence and the inferences to be drawn from it in nowise depend upon the San Francisco arrest. Though the copy of the car rental contract expedited the investigation, the chain of evidence inevitably led to the same result quite aside from that document. The Thunderbird automobile abandoned on a street in downtown Fresno would have led the police to its owner, Hertz Corporation; the original car rental contract in its possession would have led to defendant just as surely as did the copy found on his person. The Hertz people provided the lead to the taxi driver who drove defendant to the airport to pick up the Thunderbird, and to his testimony and his records. Furthermore, the book of matches led police to the

employees of the motel who identified defendant, his two companions, the Thunderbird and the Mercury; a maid testified that she saw both the Mercury and the Thunderbird parked outside defendant's motel room the morning of the robbery. Usual and commonplace investigatory procedures would have developed the damaging evidence that convicted defendant, quite aside from the illegal search which turned up a copy of the Thunderbird car rental agreement. To state our conclusion in the terms of *People* v. *Bilderbach, supra,* at page 766, quoting from *Wong Sun* v. *United States, supra,* the connection between the illegally secured evidence and the evidence adduced at the trial from independent sources, "became so attenuated as to dissipate the 'taint.' "

■ Defendant asserts the court erred in permitting several witnesses to identify a photograph of his Mercury automobile as the car they saw in Fresno. It is argued that the car was illegally impounded by the San Francisco police and since the illegal seizure made it inadmissible as evidence, the photograph was likewise inadmissible. The witnesses had observed the Mercury in Fresno, they described it accurately and in detail. Defendant himself described his car and located it in Fresno at all pertinent times. Identifying a photograph of the car, if error, was harmless as it was, at most, cumulative.

■ Defendant makes a bifurcated attack upon use of a diagram of a store floorplan that was received in evidence. First, he alleges it was illegally seized. However, it was discovered upon the person of defendant at the time he was legally booked at the request of Fresno police who had reasonable cause to suspect that defendant had committed a felony. (Pen. Code, § 836.) It was properly admitted in evidence. (*People* v. *Woods,* 139 Cal.App.2d 515, 525 [293 P.2d 901]; *People* v. *Reed,* 202 Cal.App.2d 575, 580 [20 Cal.Rptr. 911].)

■ His other argument concerning the diagram is that the court erred by permitting Mr. and Mrs. Shields to testify whether it resembled the floorplan of their store. This, says defendant, was an interpretation and comparison that the court was capable of making without the aid of an expert. Mrs. Shields testified that she designed the floorplan of the store and, of course, Mr. Shields as owner had special knowledge of his own premises. ■ Whether a witness comes within the classification of "expert" rests to a large degree upon the discretion of the trial judge. (*Kastner* v. *Los*

*Angeles Metropolitan Transit Authority,* 63 Cal.2d 52, 57 [45 Cal.Rptr. 129, 403 P.2d 385].) ▮ In the light of their special knowledge, we find no abuse of discretion in permitting the owners to testify concerning the resemblance between the diagram and the arrangement of their store. (See *Zelayeta* v. *Pacific Greyhound Lines,* 104 Cal.App.2d 716, 726 [232 P.2d 572].)

▮ Some five days after defendant was arraigned, and at a time when he was represented by counsel, a Fresno police officer went through his personal belongings, discovered a sewn-up pocket which he opened and in it found a letterhead of a Vancouver, British Columbia, motor hotel, upon which was the notation: "Fresno. Main Drag. Thistlewaite & Swift." The officer obtained the material without a search warrant several days after the arrest and arraignment. Additionally, he went to defendant's cell and questioned him about it without first getting the consent of defendant's attorney. Certainly the note was illegally obtained and erroneously admitted in evidence, but in view of the overwhelming evidence of defendant's guilt, we do not view the error as prejudicial. ▮ Erroneous introduction of illegally-seized evidence does not require a reversal unless on the entire record of the case, including the evidence, the reviewing court concludes that a miscarriage of justice has ensued. (Cal. Const., art. VI, § 4½; *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243]; *People* v. *Cruz,* 61 Cal.2d 861, 867 [40 Cal. Rptr. 841, 395 P.2d 889]; *People* v. *Parham,* 60 Cal.2d 378, 385-386 [33 Cal.Rptr. 497, 384 P.2d 1001].) Not only is the evidence of defendant's guilt overwhelming but his exculpatory testimony designed to free him from the toils of the established facts in the case, facts he himself freely admitted from the witness stand, was so implausible that the trial court was justified in disbelieving him.

▮ We take up, next, defendant's contention that statements elicited from him by the Fresno officers during the trip from San Francisco violated the constitutional principles enunciated in *Massiah* v. *United States,* 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]; *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], and kindred cases. Defendant was not advised of his absolute right to remain silent *and* his right to the services of an attorney (*People* v. *Stockman,* 63 Cal.2d 494, 500 [47 Cal.Rptr. 365, 407 P.2d 277]), before being questioned during the trip

to Fresno, nor was he advised of these rights before being questioned by two deputy district attorneys at police headquarters upon his arrival in Fresno and before he was booked. However, cases construing the import of *Escobedo* and *Dorado* tell us that the rule of *Dorado* is not a rubric to be applied mechanically as an isolated concept, rather, it is a basic principle to be applied according to the circumstances of each case. The Supreme Court said, in *People* v. *Stockman, supra,* at pages 497-498: ''In determining whether the police carried out a 'process of interrogations,' we must 'analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.' ''

In the light of the foregoing guidelines, we direct our attention to the interrogations of defendant and take up, first, statements made during the automobile ride from San Francisco to Fresno. Our case would seem to come within the rationale of *People* v. *Cotter,* 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862]. There the court said that questioning the defendant by the police on the way to the station, without first advising him of his right to an attorney and to remain silent, did not violate the principles of the *Escobedo* and *Dorado* cases since the police merely asked the defendant to state what happened. The court said, at page 393: ''They were affording him an opportunity which police officers normally and routinely offer to any person whom they are taking into custody to give any explanation of his conduct which he may desire to give. It is a routine means of commencing an investigation.''

On the other hand, we learn from a later case, *People* v. *Stockman, supra,* at page 499, and from *People* v. *North,* 233 Cal.App.2d 884, 888 [44 Cal.Rptr. 123], that interrogation after arrest that does not lend itself to eliciting incriminating statements is ''rare'' and ''unusual.'' The questions asked defendant during the trip did not necessarily contemplate incriminating answers, as they related largely to circumstances already known to the police, and about which there was little uncertainty. The record reflects that the questioning was conversational, rather than investigatory. Yet, it is difficult to believe the officers were not motivated by a desire to develop the information they had, information which ostensibly implicated their prisoner in the robbery. Having in

mind the qualifying adjectives "rare" and "unusual" approved in *Stockman*, we resolve any doubt we may have as to the nature of the interrogation in favor of defendant.

The second statement of defendant, taken at police headquarters, clearly violated his constitutional rights: he was not advised of his right to remain silent and, additionally, to have the services of an attorney. (*People* v. *Stockman*, *supra*.) However, defendant was not prejudiced by the admission of this interrogation in evidence or the conversation during the trip to Fresno, for two reasons. First, the statements were not confessions; they were at most admissions of known facts with exculpatory explanations. (*In re Spencer*, 63 Cal.2d 400, 407 [46 Cal.Rptr. 753, 406 P.2d 33]; *People* v. *Luker*, 63 Cal.2d 464, 475 [47 Cal.Rptr. 209, 407 P.2d 9].) Defendant admitted his association with the robbers, indeed he could do little else since he provided lodging for them at the motel; he exonerated himself by asserting that after discovering the others were drug addicts he decided to abandon them and did so by going to San Francisco. Second, defendant not only related the substance of each statement when he took the stand at the trial, but his testimony expanded them in considerable detail. In *People* v. *Mathis*, 63 Cal.2d 416, the Supreme Court said, at page 433 [46 Cal.Rptr. 785, 406 P.2d 65]: "Furthermore, admissions made in the course of an attempted exculpatory statement are not prejudicially received when the defendant at the trial testifies to substantially the same admissions. [Citation.] This rule is a modern adaptation of a long held doctrine that erroneous admission of evidence subsequently testified to by defendant himself is harmless."

It cannot be argued with any degree of conviction that defendant's testimony was impelled by his extrajudicial statements since aside from them ample evidence linked him to the crime. The case is readily distinguishable from *People* v. *Polk*, 63 Cal.2d 443, wherein the court pointed out, at pages 448-449 [47 Cal.Rptr. 1, 406 P.2d 641], that "When defendants testified, the only substantial evidence connecting them with the Fambro murder, for which the jury fixed the penalty at death, was their inadmissible extrajudicial confessions and admissions . . . , their testimony was impelled by the erroneous admission of the confessions and cannot be segregated therefrom to sustain the judgment."

Here, defendant was linked to the crime by the testimony of the motel manager and two motel maids, the testimony of

the proprietor of the jewelry store who identified defendant as a visitor in the store on the Saturday preceding the Monday robbery, the discovery of the abandoned Thunderbird near the scene of the robbery, defendant's rental of the Thunderbird, testimony of the taxi driver and his records, defendant's possession of a diagram of the jewelry store floorplan, the keys to his Mercury automobile in the possession of one of the robbers, and his flight to San Francisco. It was the overwhelming circumstantial evidence of guilt, not his exculpatory statements, that impelled defendant to testify.

Since the statements, even though improperly elicited, do not constitute confessions, we may consider their erroneous admission in evidence in the light of the entire record, to determine whether defendant was prejudiced. (Cal. Const., art. VI, § 4½.) This accords with the holding in *People* v. *Luker, supra,* wherein the court said, at page 475: "Although the statements . . . appear to have been improperly elicited, they do not constitute confessions; we must therefore, in the light of the entire record, determine whether the statements caused defendant prejudice. [Citation.] Since defendant's testimony presented to the jury the substance of his statements to the officers, and since the devastating testimony of Maurice so deeply involved him in the crime, we cannot believe the erroneous admission of these remarks could have caused prejudice. Whether we view the record in light of *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], or *Fahy* v. *Connecticut* (1963) 375 U.S. 85 [84 S.Ct. 229, 11 L.Ed.2d 171], we find no prejudice in this case." (See also *In re Spencer, supra,* at p. 475.)

In view of the entire record, we conclude that the introduction in evidence of the statements of defendant was not prejudicial. (Cal. Const. art. VI, § 4½; *People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

▮ Defendant alleges a violation of Penal Code section 825, requiring that "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays; . . ." Approximately 32 hours elapsed between defendant's illegal arrest by San Francisco police and his appearance before a magistrate in Fresno. This is well within the two-day maximum specified in section 825 and, considering the time required for the Fresno officers to drive to San Francisco and return with defendant, we find no ground for reversal.

There remains for consideration defendant's contention that the court erred in denying his request for a jury trial. When defendant was arraigned, he was represented by private counsel. He pleaded not guilty as to both counts and personally as well as by his counsel, waived a jury trial. He asked for a trial at an early date, and the court fixed November 13, 1964. On November 9, defendant appeared in court with his counsel, who asked to be relieved of his obligation to represent defendant because of a conflict of interest. The court granted the request, and said: "Now, your trial is set for Friday. That, of course, gives your attorney very little time to prepare for it. What is your wish in that matter?

"Mr. Thomsen: I would like to continue at this time, your Honor. I have been incarcerated very nearly three months.

"The Court: You say you would like to go to trial at that time?

"Mr. Thomsen: Yes, sir."

When the case came on for trial, defendant's counsel made the following motion: "Mr. Shepard: I would like to make one other request for the record. I understand that the defendant at one time has waived a jury. I realize that this may be late but the defendant would like to have a jury trial and I specifically make that request on his behalf, for the record.

"The Court: Well, what is the feeling of the District Attorney's Office?

"Mr. Eannie: Well, I believe, your Honor, we have had sufficient time for Mr. Thomsen to make up his mind in this case. He has waived a jury for some time. We had no indication that he had changed his mind of a jury trial. We have had him in court subsequent to the time he waived the jury.

"The Court: Yes; not only one but two waivers.

"Mr. Eannie: And in addition to that he has been represented by counsel since the commencement of the case.

"The Court: The motion will be denied."

In discussing a similar question in *People* v. *Osmon,* 195 Cal.App.2d 151, the court said, at page 154 [15 Cal.Rptr. 263] : " '. . . In the exercise of the discretion thus vested in it, the court may consider such matters as the timeliness of the motion to withdraw the waiver and whether a delay of the trial or inconvenience to witnesses would result from the granting of such motion. . . . On the other hand, where the request to withdraw the waiver of a jury trial is made *suffi-*

*ciently in advance of trial* so as not to interfere with the orderly administration of the business of the court or to result in unnecessary delay or inconvenience to witnesses or to the prejudice of the other party to the action, the court should exercise its discretion to allow the moving party the jury trial he seeks. . . .' " (Italics added.)

In the *Osmon* case, which is cited by defendant, request to withdraw waiver of jury trial was made one week before the trial date. *People* v. *Melton*, 125 Cal.App.2d Supp. 901, 904 [271 P.2d 962, 46 A.L.R.2d 914], also relied upon by defendant, concerned a motion to withdraw waiver of jury 13 days prior to the trial date. Here, the motion to withdraw waiver of trial by jury was not made until the trial was commenced. We cannot say that as a matter of law the trial court abused its discretion in denying the motion.

▮ Although the question was not raised, we are convinced that defendant suffered double punishment, which is prohibited by Penal Code section 654. He was found guilty of count one, armed robbery, and of count two, conspiracy to commit the same robbery, and ordered to serve concurrent sentences. The record reflects that defendant's intent, course of conduct and objective constituted an individual transaction culminating in the commission of the armed robbery. Thus the two sentences, even though ordered served concurrently, violate Penal Code section 654. (*People* v. *McFarland*, 58 Cal.2d 748, 760-763 [26 Cal.Rptr. 473, 376 P.2d 449]; *People* v. *Quinn*, 61 Cal.2d 551, 555 [39 Cal.Rptr. 393, 393 P.2d 705]; *People* v. *Keller*, 212 Cal.App.2d 210, 220 [27 Cal.Rptr. 805].) As pointed out in *McFarland*, section 654 does not proscribe double conviction but double punishment. Therefore the concurrent sentence for the conviction of conspiracy to commit robbery, first degree, cannot stand.

▮ A related question arises from a recital in the judgment that defendant was armed with a deadly weapon at the time of the commission of the offense. Under Penal Code section 12022, the finding subjects defendant to a mandatory consecutive sentence of not less than 5 years nor more than 10 years. Yet because one of the robbers was armed with a deadly weapon, defendant was convicted of robbery in the first degree, rather than robbery in the second degree which carries a lesser sentence. The case of *In re Shull*, 23 Cal.2d 745 [146 P.2d 417], discusses the basic principle involved, though in relation to another crime. The court said, at page

751: "Briefly, the Legislature has fixed the punishment for an assault where a deadly weapon is used, a particular crime, and it is not to be supposed that for the same offense without any additional factor existing the added punishment should be imposed. In felonies where a deadly weapon is not a factor in the offense, the additional punishment is imposed by section 3 of the Deadly Weapons Act, because of the additional factor of a deadly weapon being involved." (See also *In re Rodgers*, 121 Cal.App. 370 [9 P.2d 223]; *People* v. *Pheaster*, 215 Cal.App.2d 754 [30 Cal.Rptr. 363].)

The finding must be stricken because the statutorily-increased penalty does not apply to this offense. (*People* v. *Ford*, 60 Cal.2d 772, 794 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Bryant*, 154 Cal.App.2d 121, 129 [315 P.2d 734].)

The judgment as to count two, imposing a sentence for conspiracy to commit robbery, first degree, is reversed; as to each count the judgment is modified by striking therefrom the following language: "Defendant was charged and admitted being, or was found to have been armed with a deadly weapon at the time of the commission of the offense, or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code Sections 969c and 3024." In all other respects the judgment is affirmed.

Conley, P. J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 23, 1966.