[Crim. No. 9868. Second Dist., Div. Three. Apr. 16, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIE CHARLES HILL, Defendant and Appellant.

Willie Charles Hill, in pro. per., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, J.—Under the compulsion of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361] appellant's conviction of kidnaping and second degree robbery must be reversed.

The People's case consisted chiefly of the story of one Mack Mills who claimed that on March 14, 1963, appellant pulled his car alongside Mills' car at a signal, pointed a gun at him and demanded money. Mills gave him $30. Appellant said it was not enough, ordered Mills to pull around the corner, got into his car, drove it around a couple of corners and hit

him across the head with his gun. Begging for mercy Mills told appellant that he had $300 at home. Appellant then drove to the home and at gun point secured $300 which Mills had on the piano and $50 which he had under a rug. Mills was then driven a couple of blocks away and released. Mills' testimony was corroborated by a doctor who on March 14, 1963, treated Mills for a cut and hematoma behind his left ear. The wound was one inch long and required five or six stitches.

Mills was not a very reliable witness. He accounted for the cash in his possession by saying he won it gambling. He was most reluctant to admit any prior acquaintance with appellant, stating that he had seen him once before with a young lady at Imperial and Wilmington. At the preliminary hearing he denied that he had ever seen appellant before the incident of March 14. He admitted telling the police officers right after the incident that he had never seen appellant before. He had been convicted of three counts of burglary in 1951. He denied that appellant also took heroin from him on the occasion of the robbery and denied that his occupation was that of a narcotics peddler. He admitted that in 1963 until the robbery he earned only about $80 from his employment as a musician. His testimony at the preliminary hearing concerning the events in the house was significantly different from his testimony at the trial. He admitted knowing one of the persons in appellant's car at the time he was stopped. A police officer described him as evasive when reporting the crime.

As part of his defense appellant produced three witnesses, residing at Chino, San Quentin and Folsom, respectively, the substance of whose testimony was that appellant and Mills had been acquaintances of long standing.

Appellant was arrested on April 1, 1963. Shortly following his arrest he was questioned by police officers, the conversations being recorded on tapes. Much testimony was taken by the court concerning the voluntariness of the statements made by appellant to the police, appellant claiming that he was choked and beaten and denied the right to consult with counsel, the police denying any physical abuse. Appellant was evidently not believed by the trial judge and two tapes were admitted into evidence and heard by the jury. Whether the jury believed appellant or the police, we do not know.

The tapes have been transmitted to this court. The court reporter states on the record that she was unable to transcribe

one correctly and apparently never even attempted to follow the other. Indeed large portions are unintelligible. An understanding of the contents is aided somewhat by the nature of appellant's testimony at the trial and the partial transcription of the one tape. Basically what appellant told the police appears to be this: Mills was a peddler of narcotics with whom appellant had had some kind of a transaction sometime before March 14, 1963. On the occasion in question he did enter Mills' car and immediately struck him a blow with his fist, but not with a gun. In fact he was not armed. At Mills' house he robbed him of a quantity of heroin and—this is rather vague on the tape—of some money.

The police also recorded another conversation between appellant and one Shattio,[1] in which appellant made rather vague admissions concerning his getting rid of a gun and having $500 on him at the time of his arrest.

This particular tape was not played for the jury in its entirety but a police officer who had listened to the conversation testified to what was said. Appellant's counsel found it advisable to cross-examine the officer and brought out that in the conversation appellant also told Shattio that he had acquired the gun because he had been told before his arrest that one Abe Lincoln had been employed by Mills to do bodily harm to appellant. It was also brought out that in numerous places on the tape appellant had claimed that there was no robbery and no money was taken and further, that appellant did not have a gun at the time. This gave the prosecution an opportunity, on redirect examination, to bring out that there was another reference on the tape to the effect that money was, in fact, taken.

Appellant took the stand in his own defense. Just what his story was is difficult to tell, even though this time the reporter undoubtedly got it down correctly. In the main it seems to agree with what he told the police the night of his arrest. This was his version: He had known Mills for 13 years. He called him "Mack the Knife." On the day of the incident in question he had been looking for Mills, having some complicated and rather incomprehensible grievance against him in connection with a narcotic transaction in which he had obtained a quantity of the drug from Mills for retail distribution on consignment. He saw Mills in his car

[1]The information named Shattio as a codefendant, but he was not present at the trial.

at 108th Street and Wilmington and blew his horn at him trying to stop him. Mills complied. He obtained no money from Mills on that occasion. He approached Mills' car and they discussed narcotics and money, appellant claiming that Mills owed him $500.[2] He did not strike him there. Mills asked him to come over to somebody's house, where he would give him heroin. Appellant said "give me my money or my dope right here, I am going to hurt you right here, Mack. I don't want to hurt you, so give me my stuff right here." He then got into Mills' car and they drove to his house. They entered the house, Mills made a quick dash for the bedroom, appellant struck him with his fist and Mills then gave him two balloons of heroin. He was not armed at the time of this incident. When appellant left Mills, he was not bleeding from any place except from the nose.

Appellant, who had been charged with kidnapping for the purpose of robbery and robbery was, as has been noted, convicted of the lesser offense of kidnapping. The robbery was fixed at second degree, implying that the jury found that appellant was not armed at the time.

It is thus apparent that the conversation between appellant and the police officers which was admitted in evidence amounted to a full confession of the crimes of which appellant was convicted. While it is true that appellant corroborated the confession on the stand, improving only on the kidnapping aspect by denying that he struck Mills when he first got into his car and denying that he took any money, it seems clear that had the confession not been admitted into evidence, appellant might never have taken the stand at all and the prosecution's case would have consisted of the story of a badly impeached victim on whose testimony a jury may have been extremely reluctant to convict.[3]

---

[2] We do not know whether under the law and mores of appellant's milieu there was any basis to this claim, but for what it is worth, this seems to be it: When Mills gave appellant the heroin on consignment, it was with the understanding that Mills would receive 60 per cent of the proceeds. Appellant had no intention at the time of keeping his part of the bargain, because he was taking all the risks. Further, it was his feeling that Mills had given him the heroin in order to belittle him in front of his girl. Apparently appellant was somehow persuaded, before the incident in question, to give Mills $500 anyway, but this was only on condition that Mills supply him with more heroin. Mills took the money but did not comply with the condition.

[3] We note that to some extent the verdicts rendered by the jury indicate that appellant's version of the facts was more acceptable than Mills'. Speculation along that line is, however, rather fruitless in view of the prosecution's burden of proof and the possibility that the verdicts were motivated by mercy, rather than disbelief.

The Supreme Court of the United States has held that if a judicial confession is provoked by the admission of illegally obtained evidence, the conviction cannot stand. *Fahy* v. *Connecticut*, 375 U.S. 85 [84 S.Ct. 229, 11 L.E.2d 171]. The court said: ''It was only after admission of the paint and brush and only after their subsequent use to corroborate other state's evidence and only after introduction of the confession that the defendants took the stand, admitted their acts, and tried to establish that the nature of those acts was not within the scope of the felony statute under which the defendants had been charged.'' (*Ibid.* p. 91.) It seems to us that in the application of this rule no logical distinction can be made between real evidence illegally seized, as was the case in *Fahy,* and a confession obtained in violation of the rules announced in *Escobedo* and *Dorado.*

There is no evidence that appellant was advised of his right to counsel and of his right to remain silent. While it was his version of the incidents leading to the confession that he demanded counsel—a fact not expressly denied by the police —his request, if made, was certainly not complied with and the interrogation continued. Thus if appellant's version is true, the facts closely parallel those of *Escobedo* v. *Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].

Appellant's conduct both at the trial level and in the handling of his appeal has been as bizarre as the facts related by him. The record shows that he is no stranger to court proceedings. It is obvious to us that his many motions, his disagreements with court-appointed counsel, his charges of collusion, his refusal to have counsel appointed on appeal, followed by a request for counsel, which in turn was followed by an indignant refusal of help, were prompted only by a desire to create confusion and an appealable issue. Had *Escobedo* and *Dorado* not come to his rescue pending this appeal, we would feel bound to affirm his conviction.

We would however be remiss in our duty if we did not mention one matter which may under certain circumstances become troublesome at a retrial: It is of course quite possible that at such a retrial the People will be able to lay the necessary foundation to make the tape recordings admissible under *Dorado* and *Escobedo*. In that case the quality of the tape recordings will become an issue. We hesitate to say that they are so poor as to be worthless. At the trial no one raised an issue concerning the quality of reproduction. Perhaps the trial court had superior equipment. It is also conceivable—we

are not experts—that at the next trial it will be possible to improve the quality of reproduction by toning down background noises, bringing out certain speakers more clearly and the like. These are problems with which the trial judge will have to deal in the light of applicable law. (See *People* v. *Spencer*, 60 Cal.2d 64, 78 [31 Cal.Rptr. 782, 383 P.2d 134]; *People* v. *Mulvey*, 196 Cal.App.2d 714, 719 [16 Cal.Rptr. 821]; McKinney's New Cal. Digest, Criminal Law, § 525.5.)

The judgment is reversed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied May 10, 1965, and respondent's petition for a hearing by the Supreme Court was denied June 16, 1965. McComb, J., was of the opinion that the petition should be granted.