[Crim. Nos. 8417, 8436. In Bank. Nov. 10, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES ROBERT STOCKMAN, RONALD ANTHONY CATHCART and GENEVIEVE HUMBLE, Defendants and Appellants.

Eric A. Rose, Richard Levin and Kate Whyner, under appointment by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and George J. Roth, Deputy Attorney General, for Plaintiff and Respondent.

PETERS, J.—The three appellants were convicted of the first degree murder of Carroll Clayton Elwell. The jury imposed the death penalty on Stockman. His appeal is automatic. (Pen. Code, § 1239, subd. (b).) Appellants Cathcart and Humble were sentenced to life imprisonment. They appeal from the judgments so providing.

On January 5, 1964, Stockman, Cathcart, Miss Humble and Mrs. Horning, the latter two being sisters, left Florida in Stockman's car and came to California. They ultimately arrived in Long Beach, where, on January 11th, they checked in at a motel. Because they were short of funds, they checked out of the motel the next day, January 12 (a Sunday), intending to sleep in the car. The motel owner, however, permitted them to move back into their room for another night without charge.

At 4:30 in the afternoon on Sunday, the parties discussed the problem of how to raise some money. It was agreed that the two women would go to a bar and meet some men and set them up so they could be "rolled." Stockman gave each girl one dollar to get started.

The two women, Humble and Horning, went to a bar where they met Elwell (the victim) and Snider. The four left the bar in Snider's car and went to Elwell's motel, stopping off at a liquor store on the way. Snider wanted to be alone with Horning, so he suggested that Elwell leave in Snider's car with Humble. Humble took Elwell, who was drunk, back to the motel where she was staying. She left Elwell in the car, and went in and told Stockman and Cathcart that she had a "well-heeled sucker" in the car to be "rolled." She brought Stockman and Cathcart out and introduced them to

Elwell as her brothers. It was suggested and agreed that the four go to a bar for a drink. They all got into the car. Cathcart drove, Humble sat next to him, and Elwell sat next to her on the right side. Stockman sat in the back seat on the right side. After they had driven two or three blocks. Stockman pulled out a gun and fired two successive shots at Elwell. The first bullet struck the victim in the back and the second hit him in the head. Either shot could have been fatal. Elwell's wallet was taken and his body was pushed out of the car.

Stockman, Cathcart, and Humble returned to their motel. They then left for Las Vegas in Stockman's car. In Las Vegas, Stockman sold his car and used the proceeds to buy a bus ticket to Pennsylvania. Cathcart and Humble were arrested near Las Vegas by the Las Vegas police on January 19th, and Stockman was arrested by the FBI in Philadelphia on January 28th.

The only evidence concerning what happened after Humble and Elwell left Snider and Horning came from statements given by the appellants. These statements were incriminating. Whether they were confessions or admissions, if inadmissible, they were highly prejudicial. (Cf. *People* v. *Hillery,* 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382].) The prosecution put these statements into evidence by way of four tape recordings and the testimony of a police detective as to two interrogations. The primary issue on this appeal is the admissibility of these statements under the rules enunciated in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]; and their progeny.

It was held in *People* v. *Stewart,* 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97], that normally the accusatory stage is reached when the suspects have been placed under arrest and when the police ''carry out a process of interrogations that lends itself to eliciting incriminating statements.''

Here all statements were obtained after the defendants had been arrested, so it must be ascertained whether the second requirement of *Stewart* has been met. In determining whether the police carried out a ''process of interrogations,'' we must ''analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the po-

lice and all other relevant circumstances." (*Id.* at p. 579. See also *People* v. *Sears,* 62 Cal.2d 737 [44 Cal.Rptr. 330, 401 P.2d 938].) Such analysis demonstrates that in each instance the police were involved in a process of interrogations designed to elicit incriminating statements from the accused, and that, therefore, the accusatory stage had been reached.

Stockman made two statements, both of which were taped. The first was taken on January 29th in Philadelphia at the Philadelphia Police Department after Stockman's arrest by Officers Castillo and Robertson of the Long Beach Police Department, who had flown east. This interview took place in "the interrogation room." The tape begins with an announcement by Officer Castillo describing the time, place, people present, and the type of tape recorder being used. This would seem to indicate clearly that the police contemplated using the tape in evidence, and thus must have expected to obtain incriminating statements from Stockman. The questions asked also indicate this expectation. Castillo began with, "Jim, we want to uh get from you the details in connection with the homicide of one Rob—one Caroll Clayton Elwell, uh referred to by your acquaintances as Buz." During this interrogation, Stockman made a complete confession, stating facts showing murder in the course of a robbery, which is first degree murder. (Pen. Code, § 189.)

Stockman was then taken back to Long Beach, where his second statement was taken the same day. This interview was conducted essentially as a continuation of the first one. Stockman repeated his confession and added some details.

A detective from the Clark County Sheriff's Department in Nevada testified that Cathcart and Humble were arrested near Las Vegas on January 19th and were brought to "the interrogation room" individually the next morning, where they were interrogated by Officers Welch and Robertson from the Long Beach Police Department. Cathcart admitted that he was at the motel in Long Beach on the night of the killing. Humble admitted that she picked up Elwell but stated that Elwell later left her after she would not "put out." There is no other evidence concerning the factors listed in *Stewart* as relevant on the issue of whether these statements were the results of a process of interrogations designed to elicit incriminating statements. It may reasonably be assumed, objectively, that an interrogation which does elicit incriminating statements was conducted by the police for

that purpose, at least in part, and therefore the burden should be on the prosecution to show that the statements were the result of something other than a "process of interrogations that lends itself to eliciting incriminating statements. . . ." (*People* v. *Stewart, supra,* 62 Cal.2d at p. 577.) It was noted in *Stewart* that "in most cases the process of interrogations following an arrest will so lend itself. . . ." (*Id.* at p. 578.) ■ As stated in *People* v. *North,* 233 Cal.App.2d 884, 888 [44 Cal.Rptr. 123], "Since in 'most cases' the interrogation will so lend itself, in the absence of any contrary showing thereon in the record we cannot presume that this is one of the 'rare' or 'unusual' cases in which it did not so lend itself." (See also *People* v. *Andrews,* 234 Cal.App.2d 69, 83-84 [44 Cal.Rptr. 94].) *Stewart* also held, as already pointed out, that in determining whether the statements are products of a "process of interrogations," the trial court must consider such factors as "the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (*Id.* at p. 579.) The prosecution and the police are better able than the defendant to preserve evidence as to these factors for use at trial. ■ Here no substantial evidence concerning such factors was presented. Therefore, it must be held that the prosecution did not sustain its burden.

Cathcart and Humble were taken back to Long Beach where they were again interrogated, at the police department, on January 21st. Three statements were taken. All were taped. First, Humble alone was interrogated. The questions asked were clearly designed to elicit incriminating statements. For example, Officer Welch asked, "Now, Genevieve, when you went to the bar in company with your sister and met the deceased, Caroll Elwell, you went there with the intention of luring him to the motel where Mr. Stockman would be waiting and you knew at the time that Mr. Stockman was to rob Mr. Elwell?" Humble denied the killing (she said that Elwell left her), but she admitted that she went out with her sister to pick up men for Stockman to "roll."

Next Cathcart alone was interrogated. The trial court sustained Cathcart's objection to admitting this tape in evidence, on the ground that this statement was coerced by promises of leniency. Then Cathcart and Humble were

brought in together for the third and final interrogation. The questions asked here show that this too was part of a continuing process of interrogations that lent itself to eliciting incriminating statements from the accused.

It thus appears that all of the statements were obtained during the ''accusatory'' stage. These statements were not legally obtained unless appellants had previously waived certain rights. We must examine the nature of those rights and determine whether they were waived.

 There is evidence that, before any statements were taken, each appellant was warned by the police of his right to remain silent. None, however, was told of his right to counsel. This presents the problem whether a warning of the right to remain silent satisfies *Escobedo* and *Dorado,* or whether the police must also advise the accused of his right to counsel. Both warnings, and particularly the latter, must be given. This is indicated by what was said in the *Escobedo* case. That opinion was written in terms of right to counsel as well as the privilege against self-incrimination. The court framed the issue as follows:

''The critical question in this case is whether, under the circumstances, the refusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes a denial of 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as ''made obligatory upon the States by the Fourteenth Amendment,' . . .'' (378 U.S. at p. 479.) The cases relied upon by the court were right-to-counsel cases. (See, e.g., *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246]; *Gideon* v. *Wainwright* (1963) 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733]; *Hamilton* v. *Alabama* (1961) 368 U.S. 52 [82 S.Ct. 157, 7 L.Ed.2d 114]; and *White* v. *Maryland* (1963) 373 U.S. 59 [83 S.Ct. 1050, 10 L.Ed.2d 193].) Also, it appears from the facts of *Escobedo* that defendant *knew generally* of his right to remain silent. (See 378 U.S. at p. 480, fn. 1; *id.* at p. 499 (dissenting opinion).) The court, however, held this general knowledge to be insufficient. The police had told defendant that they had ''convincing evidence'' of his guilt. ''Without informing him [defendant] of his absolute right to remain silent *in the face of this accusation,* the police urged him to make a statement.'' (Italics added.) (*Id.* at p. 485.) ''Although there is testimony in the record that petitioner and his lawyer had previously discussed what petitioner should do in the

event of interrogation, there is no evidence that they discussed what petitioner should, or could, do in the face of a false accusation that he had fired the fatal bullets." (*Id.* at p. 485, fn. 5.) From this it appears that an accused is entitled to receive sound legal advice as to how to respond *to each accusation as it arises.*[1] "The 'guiding hand of counsel' was essential to advise petitioner of his rights in this delicate situation." (*Id.* at p. 486.) As a discussion with counsel before interrogation cannot anticipate every possible question put to the accused (see Enker and Elsen, *Counsel for the Suspect* (1964) 49 Minn.L.Rev. 47, 64), the accused would seem to be entitled to have counsel with him during interrogation unless he clearly and knowingly waives that right.

There is case law supporting the conclusion that a warning of the right of silence will not alone suffice. The Supreme Court of Oregon recently held that "the Sixth Amendment as made obligatory by the Fourteenth Amendment requires that before law enforcement officials can interrogate a person who is the focal suspect of a crime, such person must effectively be informed of his right to assistance of counsel as well as his right to remain silent." (*State* v. *Neely* (1965) 239 Ore. 487 [398 P.2d 482, at pp. 486-487].) In *People* v. *White,* 233 Cal.App.2d 765, 773 [43 Cal.Rptr. 905], the court held that "the right against self-incrimination may not be waived without benefit of counsel unless the right to counsel has itself been waived."

In the instant case Cathcart asked for an attorney before making a statement (he was then told that the court would appoint him one). The record also shows Stockman actually contacted an attorney by telephone (who was unable to get to him before he confessed). But the persistence of the police in continuing to interrogate the accused after such requests were made known to them clearly violated the constitutional rights of these appellants. (*Escobedo* v. *Illinois, supra,* 378 U.S. 478; *People* v. *Dorado, supra,* 62 Cal.2d 338.)

---

[1]See also *People* v. *Modesto,* 62 Cal.2d 436, 446 [42 Cal.Rptr. 417, 398 P.2d 753], where it was held that a confession was inadmissible even though defendant had discussed with his attorney before interrogation how to respond during interrogation. "Escobedo had also discussed with his attorney what he should do in case of interrogation, but in this case as in the *Escobedo* case, there is no evidence that defendant was advised as to what he should or could do in the face of the continuing interrogation that took place."

■ The Attorney General urges that the error in admitting the statements of Cathcart and Humble was not prejudicial, because Cathcart and Humble put substantially the same facts into evidence as part of their defense. It is true that Cathcart and Humble both took the stand. Humble admitted that she picked up Elwell in order to "roll" him, but she stated that she intended to cheat the money out of him rather than use force. She did not intend to harm Elwell and she did not know Stockman was carrying a gun. Cathcart admitted that he too intended to "roll" Elwell, but by this he meant picking his pockets and not harming him. Cathcart and Humble also placed in evidence the very tape recording of Cathcart's statements which the trial court had excluded as part of the prosecution's case because he found Cathcart's statements in it to be involuntary. This was introduced by Cathcart to show that his statements in the tape *next* made (which the trial court admitted) were also involuntary. It was introduced by Humble to impeach the testimony of witnesses who testified that *her* statements were voluntary.

This evidence presented by Cathcart and Humble did not cleanse the illegally obtained and admitted statements of their prejudicial effect. It is clear that the defendants would not have introduced this evidence but for the erroneous admission of the illegally secured statements. This is certainly true as to the tape which was introduced solely to cast doubt on the admissibility of another tape previously and erroneously admitted. As for Cathcart's and Humble's testimony, we do not have to rely on surmise or conjecture. Their attorney stated before he put them on the stand that he was doing so solely to show circumstances in mitigation of the facts which came out from the illegally obtained statements. He contended that the admission of the statements was error because they were coerced, and that "this going forward with the evidence at this time, that is, placing my two clients on the stand, is the direct result of that error and . . . it is not a completely free and voluntary decision on my part, but one rather that has been forced upon me by what I contend to be an erroneous ruling, and that error, if it exists, has removed from me any freedom of choice that I once had." Under such circumstances, where appellants are clearly impelled by the prior admission of illegally obtained evidence to put in evidence, the defense evidence cannot be held to have made the improperly admitted evidence nonprejudicial. (*Fahy* v. *Connecticut* (1963) 375 U.S. 85, 91 [84 S.Ct. 229,

11 L.Ed.2d 171]; *People* v. *Dixon,* 46 Cal.2d 456, 458 [296 P.2d 557]; *People* v. *Davis,* 62 Cal.2d 791, 796 [44 Cal.Rptr. 454, 402 P.2d 142]; *People* v. *Hill,* 233 Cal.App.2d 611, 614-615 [43 Cal.Rptr. 840].)

The judgments against all three defendants are reversed.

Traynor, C. J., Tobriner, J., Peek, J., Mosk, J., and Burke, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgments as to all three defendants. I am of the opinion after "an examination of the entire cause, including the evidence" (as mandated by § 4½, art. VI, of the Cal. Const.), that it is not reasonably probable that a result more favorable to defendants would have been reached in the absence of the errors noted in the opinion of the majority.

Respondent's petition for a rehearing was denied December 8, 1965. McComb, J., was of the opinion that the petition should be granted.