[Crim. No. 10308.   Second Dist., Div. Two.   Mar. 10, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIE
FLOYD TERRY, Defendant and Appellant.

682

Herbert E. Selwyn, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Leslie F. Bell and David S. Sperber, Deputy Attorneys General, for Plaintiff and Respondent.

ROTH, P. J.—On September 9, 1963, at approximately 3 a.m. California Warehouse Company in Los Angeles was burglarized. When the burglar entered, the automatic discharge of a silent alarm system alerted a private dispatching service, which in turn forthwith notified the police. An immediate police broadcast to officers in the area of the warehouse gave the address and the time of the alarm, plus a description of the clothing worn by the burglar. The source of the description was one Phillip Shafer, an eyewitness, who was unloading a truck in the vicinity of the warehouse. Shafer at the trial identified appellant as the man he had seen emerging from an open window in the warehouse at the time of the burglary. Shafer's identification was based entirely upon the clothing of the burglar.

A few minutes after receiving the call, two police vehicles,

each containing two officers, noticed appellant whose clothing matched the broadcast description, running a few blocks from the warehouse. Both cars simultaneously converged on appellant. He was stopped and his hands were handcuffed behind his back. He remained in this position until his incarceration at the police station some time later.

Appellant was searched and questioned at the scene of the arrest for approximately 10 or 15 minutes. The questions are not revealed in detail. The police stated that they asked him about the ownership of a flashlight he had in his possession and the whereabouts of some gloves they suspected had been used in the burglary. Appellant testified that he was questioned extensively about his reasons for being in that neighborhood at that time of night, and his implication in the burglary of the warehouse.[1]

Appellant was then transported to the warehouse in a police car and interrogated further. Officer Silviano Gurrola of the Los Angeles Police Department testified that appellant did not volunteer any information, and that all statements made by appellant were in response to questions directed to him by the police. Officer Gurrola's testimony concerning this interrogation was as follows:

"Q. Do you recall the first question and answer [after arriving at the scene of the crime], or at least to the best of your ability? A. At the warehouse? Q. Yes. A. Yes, we asked him how he got into the warehouse. Q. What did he say? A. He said he had gotten in through the window, the one he came out of."

Officer Gurrola then investigated the premises to verify this story. The testimony continues:

"A. I went back [to the police vehicle] and said he couldn't have gotten in through that window, there wasn't a set of boxes there that he claimed he had taken . . . and threw out the window. Q. You heard him say something about boxes, did you? A. Yes, he said he had taken some boxes off of a flat and had thrown them out the window. . . ."[2]

---

[1]Appellant claimed throughout the trial that he was severely beaten during the entire period of this interrogation, and that the officers involved would not cease their violence until he confessed. Apparently, neither the trial court nor the jury gave much credence to this testimony, and the coerced nature of the confession is not an issue on this appeal.

[2]There was evidence in the case that some cartons of bubble bath had been taken from inside the warehouse and were found on the ground outside the warehouse.

Officer Martin participated in the interrogation and testified as follows:

"Q. To the best of your ability to do so, would you tell us what questions were put to him and what answers he gave? A. I asked the defendant how he got into the warehouse on Wholesale Street and his first response was that he got in through the window, he got in the same way he got out, through the same window . . .And Officer Gurrola got out of the car and checked the front window and came back to the car and stated to me that he didn't get in that way. Q. Was this in the presence of the defendant? A. That is right. Q. Then what happened? A. I questioned the defendant more about it and at this time he stated that he got in through a rear window.

". . . . . . . . . . . . ."

Officer Martin further testified that under interrogation, the defendant described to the police how he obtained entry to the building and his reasons for burglarizing the warehouse.

The cause was tried to a jury, and appellant was found guilty of burglary in the second degree (Pen. Code, § 459) with five prior felony convictions. Appellant's appeal is from the judgment of conviction and based solely on *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

Appellant argues that the evidence of his statements to the police obtained during the interrogation at the warehouse, which constituted a full confession, was illegally admitted and therefore a reversal is required under *People* v. *Dorado, supra,* at page 356.

*Dorado,* of course, establishes the rule that statements of a defendant made to the police are inadmissible where (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on the particular suspect; (2) the suspect was in custody; (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements; (4) the authorities had not effectively informed defendant of his right to remain silent and right to counsel, and no evidence establishes that he has waived those rights. (*People* v. *Dorado,* 62 Cal.2d 338, 347 [42 Cal.Rptr. 169, 398 P.2d 361].)

█ It is settled that when the record is silent we must presume that appellant was not informed of his rights to counsel and to remain silent. (*People* v. *Stewart,* 62 Cal.2d 571, 581 [43 Cal.Rptr. 201, 400 P.2d 97].) Respondent argues, however, that the interrogations herein detailed were during the inves-

tigatory stage, and therefore, the police were under no duty to inform appellant of his constitutional rights.

The principal question in this case is whether the accusatory stage had been reached. We think it had.

*Stewart, supra,* holds that the second and third factors listed in *Dorado (People* v. *Stewart, supra,* at p. 577) are the test. To the same effect see also *People* v. *Mathis,* 63 Cal.2d 416, 431-432 [46 Cal.Rptr. 785, 406 P.2d 65].) We must decide, therefore, whether appellant (1) was under arrest, and (2) whether a process of interrogations had been undertaken that lent itself to eliciting incriminating statements.
■ ''Whenever the two conditions are met, . . . the accusatory or critical stage has been reached and the suspect is entitled to counsel.'' *(People* v. *Stewart, supra,* at p. 577.)

■ At the time of the interrogation in question, appellant had been physically restrained with handcuffs, interrogated for a substantial period of time, and (presumably unwillingly) transported from the scene of the detention to the site where the crime was committed. Such a restraint goes far beyond temporary detention for the purpose of making inquiries: *(People* v. *Anguiano,* 198 Cal.App.2d 426, 429 [18 Cal.Rptr. 132] ; *People* v. *Morris,* 211 Cal.App.2d 274, 278 [27 Cal.Rptr. 129]) and constitutes an arrest. (Pen Code, §§ 834, 835; *People* v. *Gibson,* 220 Cal.App.2d 15, 21 [33 Cal.Rptr. 775].)

■ In ascertaining whether a process of interrogation had begun we must ''analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.'' *(People* v. *Stewart, supra,* at p. 579.)

Here, the length of the crucial interrogation at the warehouse is not revealed, but the record does show that appellant had already been questioned for 10 or 15 minutes at the time of the arrest. ■ The interrogation at the time of the arrest shortly after the crime had been committed, and before the police had time to acquire much data relevant to its commission, may be classed as investigatory. However, when appellant was taken from the point of arrest to the warehouse and there confronted with the type of questions of which we have made a verbatim excerpt, the accusatory stage had been reached. That this is so, is demonstrated by the nature of the questions which show on their face that they were designed to

elicit a confession or incriminating statements. When the parties arrived at the warehouse, the police were no longer merely inquiring whether appellant might have committed the crime; they were asking *why* he did it, and in what manner. The questions assumed appellant was the burglar, and each response carried with it an implicit confession of guilt. In addition, the police themselves admitted that appellant's statements were made only in answer to questions posed by the police, and that the accused volunteered nothing. Objectively, therefore, the facts impel us to the conclusion that a process of interrogation was carried on that lent itself to eliciting incriminating statements.

Moreover, since such a process of interrogation is normally conducted after arrest (*People* v. *Stewart, supra,* at p. 577), the courts will presume that fact, and the burden is on the prosecution to negate it. (*People* v. *Stockman,* 63 Cal.2d 494, 498-499 [47 Cal.Rptr. 365, 407 P.2d 277].) In the instant case, the prosecution has failed to sustain that burden.

*People* v. *Ford,* 234 Cal.App.2d 480 [44 Cal.Rptr. 556], relied on by respondent, does not hold to the contrary. In *Ford,* the police found the defendant in a vehicle reported as stolen. In a brief conversation prior to arrest, the defendant was able to give the name, but not the address, of the registered owner of the car. He was then arrested and subjected to an interrogation which resulted in some incriminating statements. The court said: "Although Ford was under arrest on suspicion of car theft, there is nothing to suggest the arresting officers were conducting 'a process of interrogations' in an accusatorial manner designed to make him confess. At that point it appears the arresting officers were still trying to find out whether a crime had actually been committed and whether Ford should be held to answer for it." (*People* v. *Ford, supra,* at p. 487.)

We conclude that the interrogation at the warehouse had reached the accusatory stage, and since the statements made by appellant at the warehouse constituted a confession, reversal under *Dorado* is required, unless the facts here constitute one of those "rare cases" in which the prejudicial error rule would compel affirmance despite the admission of the confession into evidence. (*People* v. *Jacobson,* 63 Cal.2d 319, 330-331 [46 Cal.Rptr. 515, 405 P.2d 555].) This, in our opinion, is not one of those rare cases.

The judgment is reversed.

Herndon, J., concurred.

FLEMING, J. Dissenting.—In my view this decision has things topsy-turvy. By accelerating the accusatory stage it forces premature bookings of suspects, thereby making life harder on the innocent and easier on the guilty.

The court overturns a routine conviction for burglary growing out of the following events:

About 3 a.m. the silent burglar-alarm system at the California Warehouse was activated, and at the same time a teamster across the street heard the sound of breaking glass and saw a man in green shirt and grey pants with a flashlight emerge from a broken window of the warehouse. The police patrolling the area received a broadcast report of the alarm and a description of a suspect, and about 3:15 a.m. they apprehended Terry running south on Imperial near 7th, two and a half blocks from the warehouse.

Officer Gurrola handcuffed Terry, searched him and found a flashlight in his rear pocket. He asked Terry if the flashlight was his, and Terry said yes. Officer Gurrola then put Terry inside the police car and asked him what he had done with the gloves. Terry said he didn't have any gloves. Officer Gurrola asked no further questions but started to search for gloves. His partner, Officer Martin, did not question Terry at this time, and he too searched for gloves. After 10 or 15 minutes these two officers drove to the warehouse with Terry.

At the warehouse the teamster witness identified Terry as the man he had seen coming out of the broken warehouse window, basing his identity on the shirt, the pants, skin coloring, and build. Terry was then questioned for the first time about activities at the warehouse. Officer Martin testified, ''I started questioning the defendant at this time'', and Officer Gurrola testified: ''Q. Was the conversation with regard to entry and exit from the warehouse held right by the warehouse there? A. Yes.''

Officer Martin asked Terry how he had gotten in the warehouse, and Terry replied he had gotten in through the front window and thrown some boxes of merchandise out the window. Officer Gurrola checked the front window, couldn't find any boxes of merchandise there, and concluded that Terry had not got in that way. Terry then said he had entered through a rear window. Officer Gurrola checked again and in the darkness couldn't find an open rear window and came back to Terry, who said in response to questions by Officer Martin he had put a ladder on top of a box car and entered through a

second-story window which he knew was not wired for burglar alarm. Officer Gurrola then found a ladder near a box car, an open window 4 to 5 feet above the top of the box car, and boxes of merchandise on the ground below the open window. The police took Terry and the merchandise to the police station, where Terry was booked. About an hour had elapsed from the time Terry was first seen by the police until he was booked at the station.

The questions put to Terry were broken down at the trial into five different instances. The first was on his apprehension and search, at which four officers were present, in which he was asked whether the flashlight was his. The second was in the police car at the same location, at which Officers Gurrola and Martin were present, in which he was asked about gloves. The third, fourth, and fifth instances were in the presence of Officers Gurrola and Martin in the police car at the warehouse, in which he first said he got in the front window, then in the back window, and then told of the ladder on top of a box car.

The issue in this case is the admissibility in evidence of Terry's answers to questions at the warehouse. When a suspect has become an accused and the purpose of questioning is to get him to confess his guilt he may not be questioned without advice as to his constitutional rights and an opportunity to obtain counsel. (*Escobedo* v. *Illinois*, 378 U.S. 478, 485, 492 [84 S.Ct. 1758, 12 L.Ed.2d 977] ; *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].) Nothing in the rule, however, limits the power of the police to investigate unsolved crimes and gather information from witnesses. From *Escobedo* and from *Dorado* has evolved the rule that a suspect may be freely questioned while the case is still in the investigatory stage, but may no longer be so questioned after the case has reached the accusatory stage and the suspect has become, for all practical purposes, an accused.

In my view, the questioning of Terry at the warehouse occurred during the course of a field investigation at the scene of events and before Terry had become, for all practical purposes, an accused. Certainly Terry was a suspect, but in no real sense could he be considered an accused at that time. The police were still investigating the facts in order to determine whether a crime had been committed, what the crime was, whether there was probable cause to believe Terry had committed the crime, and whether there was sufficient evidence to charge him.

Consider for a moment the status of the investigation at the

time of the questioning. All that the police on the scene then knew was that a burglar alarm had gone off, a witness had reported hearing the sound of a broken window and seeing someone with a flashlight coming out the window, the witness had identified Terry as that someone, and Terry had a flashlight. While the police had cause to suspect that a crime had been committed, and to suspect that Terry may have committed it, they had no conclusive evidence on either point (it might have been that Terry had been sleeping off a drunk in the warehouse and had decided to leave when the effects had worn off). What the crime was, how it was committed, whether their eyewitness was reliable, and whether his identification was positive, were matters which still required further investigation.

Nor was Terry as yet, for all practical purposes, an accused. With vigorous denials and a credible explanation of his activities, he might never have been taken to the police station, never been booked, or never been charged. He had no stolen property on his person. The police had no information about his entry into the premises or about his specific intention to steal. It was appropriate at that time for the police to question Terry about his presence at the warehouse. As put by Mr. Justice Traynor, concurring in *People* v. *Garner*, 57 Cal.2d 135, 164 [18 Cal.Rptr. 40, 367 P.2d 680], "So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation." And as said by Mr. Justice Frankfurter in *Culombe* v. *Connecticut*, 367 U.S. 568, 571 [81 S.Ct. 1860, 6 L.Ed.2d 1037] : "The questions which these suspected witnesses are asked may serve to clear them. They may serve, directly or indirectly, to lead the police to other suspects than the persons questioned. Or they may become the means by which the persons questioned are themselves made to furnish proofs which will eventually send them to prison or death. In any event, whatever its outcome, such questioning is often indispensable to crime detection. Its compelling necessity has been judicially recognized as its sufficient justification, even in a society which, like ours, stands strongly and constitutionally committed to the principle that persons accused of crime cannot be made to convict themselves out of their own mouths."

Nothing in the record suggests that Terry had been questioned about the burglary at the time of his apprehension on Imperial. To the contrary, both police officers testified that

Terry was first questioned about the burglary at the warehouse itself. Indeed, until the police officers had themselves gone to the warehouse and discovered some of the facts it would have been difficult for them to conduct any intelligent questioning of any suspect. After Terry had been identified by the witness as the person seen coming out of the broken window, I think the police were duty-bound to give Terry an opportunity to tell them what he had been up to that night or to explain if he could that his was a case of mistaken identity. On such questioning Terry then told the police that he had entered the warehouse by a window and thrown out some boxes of merchandise. Further inquiry by the police to clarify his specific route was a common-sense protection against misunderstanding or false confession induced by liquor, narcotics, illness, or mental disease.

The majority opinion finds the form of the police questioning at the warehouse objectionable, because according to the testimony of the officers, they put leading questions to the suspect which assumed that he had committed the act being investigated. No doubt the questions were not phrased in the neutral manner which we prefer to use in court—with nice points of grammar and syntax carefully arranged so as not to lead the witness, or to suggest answers, or to assume conclusions—but a completely neutral manner of questioning counsels a perfection which experienced trial lawyers under favorable conditions of tranquility in the courtroom do not always achieve. We cannot hold police officers on a field investigation in the warehouse district at 3:30 in the morning to standards of rhetoric which carefully-prepared lawyers in the courtroom routinely fail to meet. Unless there was something coercive in the questions—a contention which the jury decided adversely to Terry—or unless the questions were actually misleading—which essentially they were not—I think any exclusion of Terry's answers because of the structure of the questions would needlessly exalt form at the expense of substance.

The controlling principles we should apply are set forth in *People* v. *Stewart,* 62 Cal.2d 571, 578 [43 Cal.Rptr. 201, 400 P.2d 97], citing *United States* v. *Konigsberg,* 336 F.2d 844; *People* v. *Cotter,* 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862]; and *People* v. *Treloar,* 64 Cal.2d 141 [49 Cal.Rptr. 100, 410 P.2d 620], cases which properly differentiate between the status of an accused—whom we insulate from the police—and the status of a suspect—whom we encourage to talk to the

police.We circumscribe communication between an accused and the police because an accused need not incriminate himself and is entitled to the assistance of counsel for his defense. We encourage communication between a suspect and the police in the interest of solving crime and in the interest of clearing suspects. This communication benefits both groups, for it frequently solves crimes and it frequently secures the release of suspects. The benefit to law enforcement is obvious and finds no elaboration. (Wigmore on Evidence (3d ed.) § 851, p. 319.) The benefit to innocent suspects is likewise salutary. A suspect does not always end up as an accused, indeed less often than not, and vigorous denials and creditable explanations at the time of first detention often secure a suspect's release. (*Police Practices and the Law*, by Edward L. Barrett, Jr., 50 Cal.L.R. 11, 30-32.)

But if we accelerate the accusatory stage in the manner this decision suggests, a victim of circumstance may no longer be given a full opportunity to prove his innocence on the spot. If the police cannot talk to a suspect but must treat him as an accused (and it is clear that they cannot talk to an accused without advising him of his legal rights and assuring that he understands them, and making counsel available on demand (*People* v. *Ford*, 234 Cal.App.2d 480, 489-490 [44 Cal.Rptr. 556]), then their only alternative is to book all suspects against whom an ostensible case has developed and let the suspect secure his release at a later time if he can. Likewise, any acceleration of the accusatory stage which prohibits the police from making simple inquiries of a suspect on the scene, shuts off the police from the most direct, the most immediate, and in many respects the most accurate, source of information about the event under investigation. I think it no service to suspects or to law enforcement to prematurely prohibit the police from talking to suspects during field investigations on the scene of a suspected crime, talks which by vigorous and timely exchanges may lead to immediate clearance for the innocent or certainty of accusation for the guilty. Such prohibition may sire results which mock the good intentions of our purpose.

The real evil aimed at in *Dorado* is seen in *People* v. *Treloar,* 64 Cal.2d 141 [49 Cal.Rptr. 100, 410 P.2d 620] (extensive questioning at the police station), *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97] (intensive questioning in jail five days after arrest), and *In re Lopez,* 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380] (incriminating state-

ments solicited after in'dictment). In each of these cases access to counsel was feasible, as it obviously was not at 3 :30 a.m. in the warehouse district of Los Angeles.

Since the jury found against Terry on his claim of coercion, the decision reverses a valid conviction solely on technical grounds divorced from any realities of crime and punishment, guilt and innocence, law enforcement and fair trial. In so doing we have ignored the salutory provision of article VI, section 4½ of the California Constitution, which declares that no judgment shall be set aside except for a miscarriage of justice. Meanwhile, the per capita major crime rate per hundred thousand population which has almost 'doubled in the last 10 years, continues to increase while the per capita superior court felony prosecution rate continues to decline. (Crime in California-1964, a publication of the Bureau of Criminal Statistics, California Department of Justice, pp. 14, 21; Midyear Summary-1965, Table 1.) If guilty persons are able to evade conviction on purely technical grounds, the inhibiting effect of criminal law as a deterrent to crime will be seriously weakened, and the discrepancy between the major crime rate and the superior court felony prosecution rate will continue to widen. (Crime in California, 1964, pp. 26, 111.)

In my view Terry was a suspect at the scene of the crime whom the police were entitled to question in the course of their investigation. His questioning served a valid social purpose an'd was not barred by the rule of *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] or *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

I would affirm the judgment.

Respondent's petition for a hearing by the Supreme Court was denied May 4, 1966. Mosk, J., was of the opinion that the petition should be granted.