**Reyes Arias OROZCO, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 40706.**

Court of Criminal Appeals of Texas.

Dec. 6, 1967.

Rehearing Denied Feb. 7, 1968.

Charles W. Tessmer, (on appeal only), Dallas, for appellant.

Henry Wade, Dist. Atty., Dallas, Charles Caperton, Tom F. Reese and Kerry P. Fitz-Gerald, Asst. Dist. Attys., Dallas, and Leon B. Douglas, State's Atty., Austin, for the State.

## OPINION

WOODLEY, Presiding Judge.

The offense is murder with malice; the punishment, 10 years.

Trial was before a jury on a plea of not guilty. The state having waived the death penalty and the jury having found appellant guilty of murder with malice, the court assessed the punishment.

The facts necessary for consideration and disposition of the grounds of error set forth in appellant's brief, filed in the trial court, reflect the following: Appellant was seated in a booth near the front door of the El Farleto Cafe in Dallas with Hosea Miramontes and Joanne Parris when John Hugh Elliott, the deceased, came in and sat in a booth some six feet away. After eating his food and having some conversation with Joanne, the nature of which is not disclosed, the deceased left the cafe.

Shortly after the appellant and Joanne left, as did Miramontes. An argument ensued and deceased, who had gotten in his car and was driving away, pulled back into the parking place alongside of the Mira-

montes car and, according to the testimony of Miramontes, the deceased beat appellant about the face with his hands and called him "Mexican Grease." A shot was fired and Miramontes drove Joanne and appellant from the scene and, after letting appellant out, drove Joanne to the corner of Commerce and Akard and let her out.

James Ishcomer, referred to as an Indian man, and his companions, who left the cafe about ten minutes later, found Elliott, the deceased, slumped over the steering wheel of his car and thought that "a little mickey" had been put in his drink and that he was drunk, but when they raised him up they saw a bullet hole; took him out of the car and attempted to revive him by mouth to mouth artificial respiration.

Patrolman J. W. Johnson, of the Dallas Police Department, testified that while on duty on the late night shift on January 5, 1966, with another officer, he noticed 5 or 6 persons standing on the sidewalk on the west side of Cedar Springs, where there was a car with the door open. When these people saw the squad car they began to wave, and he noticed that there was a man lying in the parking area with one leg inside a Ford station wagon. Those standing by said they thought he was drunk, but "when we went to this gentleman laying on the ground and found he wasn't drunk but he had been shot * * * we called for an ambulance" and "for a detective squad, supervisor and crime lab."

"Q. I guess the Crime Lab is the one that made the picture?

"A. Yes, sir.

"Q. Okay, now, did you stay there at the scene or did you leave?

"A. No, sir, we stayed there, we tried to get all the witnesses, anyone that knew anything about it. We tried to get them to one side, they left before we got the information that we needed.

"Q. Were there any witnesses out there actually?

"A. Yes, sir, there were witnesses, I don't know whether they were the ones on the direct shooting because I didn't question any of the witnesses, detectives questioned the witnesses.

"Q. That's what I meant, was there any witnesses to the shooting itself? Was James Ishcomer one of the men that was out there?

"A. Yes, sir, the Indian.

* * * * * *

"Q. Did anyone show up from the Homicide Bureau?

"A. Yes, sir.

"Q. Who were the detectives in the Homicide Bureau?

"A. I believe it was Detective Blessing and Charlie Brown."

Patrolman Jerry C. Scarbrough testified that he was one of the arresting officers; that Officer Stubbs rode with him and they with two Homicide detectives, one of whom was Charlie Brown and the other a detective he did not know personally, went to "a private residence" on Lemmon Avenue arriving about the same time; that he went to the back of the house and the other officers went to the front; that he later went inside the house and was in the back room when the pistol was found in the washing machine.

We quote from the testimony of state's witness Brown:

"Q. Were you a police officer for the City of Dallas back on January the 5th, 1966?

"A. Yes, sir, I was.

"Q. Who was your partner on that day?

"A. Blessing was my partner.

'Q. What were your hours of duty that night?

"A. Working from six until twelve.

"Q. You're supposed to get off at twelve o'clock?

"A. Off at twelve.

"Q. Did you get off at twelve o'clock that night?

"A. No, we didn't.

"Q. What did you do that night?

"A. Well, we answered a call on Mc-Kinney, on Cedar Springs with a uniformed squad and I was working in the capacity as a plain-clothes officer with Mr. Blessing.

"Q. All right, was that at the El Farleto Cafe?

"A. Yes, sir.

"Q. Where did you go, if anywhere?

"A. We walked from that location, we went to Parkland Hospital and viewed the body at that location.

"Q. Whose body did you view there?

"A. It was a man that was a white man that's supposed to have gotten shot there and the ambulance had left and we left the El Farleto.

"Q. That's John Hugh Elliott's body?

"A. Yes, sir.

"Q. Was he alive or dead when you—

"A. —dead when we got to Parkland.

"Q. Where did you go from there, sir?

"A. We had a witness that had to go with the uniformed squad to Parkland Hospital, they were still at Parkland when we got there, it was an Indian man descent. He showed us where another boy, and told us about another boy who had been at that location—

"MR. BARCLAY: Object to that.

"MR. CAPERTON: Don't go into anything.

"THE COURT: Yeah.

"Q. Was that James Ishcomer?

"A. Yes, sir.

"Q. Did you talk to him?

"A. Yes.

"Q. Where did you go after that?

"A. We took him to another apartment and talked to the people there and then took him home from that location.

"Q. Okay, then where did you go, if anywhere?

"A. We found out who this other man was that was with the Defendant, where he lived, and we went to his home in Oak Cliff.

"Q. Was that Hosea Miramontes?

"A. Yes.

"Q. From his house where did you go?

"A. Came by town and came up Commerce and Akard and was going to show us where he let a girl out.

\*   \*   \*   \*   \*   \*

"Q. That was Hosea Miramontes that you had in your car at that time?

"A. That's right.

"Q. From this location, did he show you a location?

"A. Yes, he did on Lemmon Avenue.

"Q. Okay, then what did you do after that?

"A. We took him, after he showed us the house, we took him over to the City Hall and booked him for investigation of murder, then we returned to the location on Lemmon Avenue that he pointed out to us.

\*   \*   \*   \*   \*   \*

"Q. (By Mr. Caperton) At this time you didn't go into the house the first time you went there, is that right?

"A. No, sir, drove by that location.

"Q. Did you go get a warrant?

"A. No.

**670**

"Q. All right, when did you come back to the house?

"A. Immediately after we put the other boy in jail.

"Q. All right,—

"A. Miramontes.

"Q. Did you go then back up to the house?

"A. Back to the location on Lemmon Avenue.

"Q. All right, whose house was it, if you know?

"A. I don't recall, the Defendant did live there.

"Q. Okay, do you recall the lady's name who lived there?

"A. (Witness nods head.)

"Q. Did you have a good reason to believe that a felony had been committed?

"A. Yes, sir.

\*    \*    \*    \*    \*    \*

"Q. (Continuing) And that the Defendant or suspect was there and there was a chance of his escaping?

"A. That's true.

"Q. All right.

"MR. BARCLAY: Objection, no predicate.

"THE COURT: Overruled.

"MR. BARCLAY: Exception.

"Q. What did you do when you got to the house?

"A. Before we arrived at this house on this second street, my partner and myself, we called for a uniformed squad to meet us up there at that location. We had arrived there just about the same time, more or less, simultaneously, and we got out and told them what we had and we slipped up and so we went behind the house, some on the side and some to the front.

"Q. Did you go to the front or back?

"A. I went to the front.

"Q. What did you do when you got to the door?

"A. Knocked on the door and a lady came to the door. We identified ourselves as being police officers and wanted to talk to this man; ask—if he was home and she said yes.

\*    \*    \*    \*    \*    \*

"Q. Then you went inside the house?

"A. We were invited in, yes, sir.

"Q. All right, what did you do after you got in?

"MR. BARCLAY: If the Court please, I'm going to make an objection at this time to any further reference to the entrance of this particular house on the grounds that the testimony shows that the man was sound asleep at that time and there is no good reason to show why he couldn't have gotten a warrant or warrant of arrest to search the premises.

"THE COURT: Overruled.

"MR. BARCLAY: Exception.

"Q. Okay, you may answer the question. What did you do after you got inside?

"A. We walked in and the lady pointed to the room where this Defendant was asleep. He was awake when we got into the room and evidently heard the conversation. I don't know, but he was awake anyway.

"Q. Okay.

"A. And we asked him his name, I did. He told me.

"MR. BARCLAY: Objection.

"THE COURT: Overruled.

"MR. BARCLAY: If the Court please, at this particular time, I'm going to make an objection to any line of questioning with reference to any conversation between this particular witness and the Defendant, could I have him on voir dire examination?

"THE COURT: Not at this time, you can cross examine him."

\*    \*    \*    \*    \*    \*

"Q. About what time of day was this?

"A. That I talked to him?

"Q. Yeah.

"A. That was around, well, after four o'clock, it was around four o'clock, give or take thirty minutes.

"Q. Okay, now, what did you say, if anything, to him besides 'What's your name?'

"A. Yes, I don't recall all the conversation, I asked him his name and he told me and I asked him if he had been out to the El Farleto that night.

"MR. BARCLAY: Objection.

"THE COURT: Overruled.

"MR. BARCLAY: Could I have the witness on voir dire examination?

"THE COURT: No.

"MR. BARCLAY: Exception.

"THE COURT: Go ahead.

"THE WITNESS: He said he had. I asked him if he owned a pistol.

"MR. BARCLAY: Objection.

"THE COURT: Overruled.

"MR. BARCLAY: Exception.

"THE WITNESS: He said yes. I said, 'Where is it,' and he didn't answer at first. Then I asked him again, he says, 'It's in the back in the washing machine.'

"Q. (Continuing) Okay, did you go back to the washing machine?

"A. Yes, I asked him where the washing machine was and he pointed to a little small room in the back of the house.

"Q. I'll show you what's been marked for identification purposes as State's Exhibit No. 3 and 4 and ask you if you can identify these and, if so, how?

"A. Yes, sir, we went back to the back room, or I did, and there was a bunch of clothes in a wringer type washing machine. I took some of the clothes out, I didn't see the pistol at first. The washing machine was just about full of clothes so he came back about that time, I'll say he, the Defendant, and he was going to show us where it was so I uncovered it some more, the clothes, and took them out of the washing machine and I saw the pistol then, and I told him I would get it. This is the pistol that was taken from the washing machine by myself about 4:30 in the morning.

"Q. What did you do with it after you took it out of the washing machine?

"A. I checked it and unloaded it."

The pistol referred to in the testimony of Officer Brown was shown by the evidence to have been the gun from which the bullet which killed the deceased was fired.

Appellant's first and principal ground of error is:

"The arrest of the defendant without warrant and without probable cause rendered evidence seized from private residence of defendant in a warrantless search inadmissible."

Assuming that no warrant of arrest had been issued, we do not agree that the arrest was unlawful or that the pistol, the only evidence seized, was obtained as the result of an unlawful search or that the pistol was seized from the private residence of appellant.

A number of police officers participated in searching for those who fled the scene leaving the dying man near the cafe. They received information from Ishcomer and then from Miramontes which led them to the private residence of a lady whose name Officer Johnson did not recall, or did not give, where appellant had a room. They were admitted to the house by a lady who answered their knock and said that he was in his room asleep. They made no un-

lawful entry into the house, but were invited in.

Contemporaneous with the arrest Officer Brown asked appellant his name; if he had been out to the El Farleto Cafe that night; if he owned a pistol; and "where is it?" in answer to which questions appellant gave his name, answered the next two questions in the affirmative and the last: "It's in the back in the washing machine." Appellant then pointed out to the officers a small room in the back of the house where the washing machine was, and he was there when Officer Brown uncovered the pistol, checked it and unloaded it.

While such is argued, the ground of error does not complain that these statements of appellant should have been excluded for lack of warning required by Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, cited by appellant, but complain of evidence seized as a result of an unlawful arrest without warrant.

■ Miranda v. State of Arizona, and Escobedo v. State of Illinois, supra, apply to in-custody interrogation without regard to whether the arrest was unlawful but do not protect the accused to the extent that no inquiry at all is permissible without prior warning.

For a discussion of "custodial interrogation" under the doctrine of Miranda v. State of Arizona, supra, see Gaudio v. State, 1 Md.App. 455, 230 A.2d 700.

There is no doubt that the statements of appellant were made contemporaneous with his arrest and that the officers went to the house for the purpose of arresting him, and did arrest him as soon as they satisfied themselves that he was the man that was named by Miramontes. In fact the state offered testimony of another police officer (Scarbrough) to the effect that he was one of the arresting officers and that they went to the house for the purpose of executing a warrant which he had seen but which was not in his possession.

■ We hold that the further inquiry which led to the finding of the pistol was not precluded under Miranda v. State of Arizona, supra.

We are not impressed with the contention that Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, may be distinguished by the fact that it required more than three hours for the officers to find appellant whereas, in Warden Md. Penitentiary v. Hayden, supra, information was immediately relayed to the police by cab drivers who followed the robber from the scene and the police immediately proceeded to the house where they found the defendant, asked him to get out of bed and get dressed and arrested him, and within one hour of their entry into the house, found a sawed off shotgun in the flush tank of the commode in the bathroom, and a sweater and cap similar to those that the robber had reportedly been wearing.

■ Warden Md. Penitentiary v. Hayden, supra, supports our conclusion that the officers acted reasonably when they entered the house in search of the man whose name they had been given and for the pistol he had used to shoot the deceased.

In the recent case of United States v. Agy, 6 Cir., 374 F.2d 94, the defendant, when encountered by federal agents and questioned as to the contents of a truck, made an incriminating admission which was corroborated by an immediate search. The Court of Appeals held that it was unnecessary to determine whether probable cause for the search existed in the absence of the defendant's admission; that the agents could testify as to the contents of the truck and the admissions of the defendant need not have been excluded.

Agy was cited by this court in Sutton v. State, Tex.Cr.App., 419 S.W.2d 857, decided on rehearing November 1, 1967.

In Galloway v. State, Tex.Cr.App., 420 S.W.2d 721, decided October 18, 1967, the defendant stated to the officers who were

invited into the house, and who inquired of him where the pistol was he had used in the shooting the night before, that it was in his house, and handed the pistol to the officers. This court overruled the contention that such evidence was procured as the result of an unlawful arrest. Hinkley v. State, Tex.Cr.App., 389 S.W.2d 667, was cited in support of such holding.

Appellant's next ground of error is that the court erred in permitting the state to claim surprise and impeach a state's witness without laying a proper predicate for such claim of surprise.

This claim of error relates to the witness Miramontes who testified that he did not see Shorty (referring to appellant) shoot the deceased but heard a shot. He was then asked by counsel for the state, and answered over the objection set out:

"Q. Do you remember the Assistant District Attorney that was present at that examining trial ask you if, 'Did you see a man get shot on that evening—

"MR. BARCLAY: If the Court please, I'm going to object to the District Attorney trying to impeach his own witness.

"THE COURT: You plead complete surprise or not?

"MR. CAPERTON: Yes, Your Honor, because he's testifying to something that he did not testify to at the examining trial.

"THE COURT: Overrule the objection.

"Q. (Continuing) Did the Assistant District Attorney ask you the question, 'Did you see a man get shot on that evening?'

"A. Yes, he asked me that question.

"Q. Do you remember your answer?

"A. I told him I heard a shot.

428 S.W.2d—43

"Q. Was your answer to that question, 'I saw a man get shot.'

"A. Yes, u-huh."

■ We find no harm or detriment to appellant in the testimony of the witness as to the question asked and the answer given by him at the examining trial.

In view of the objection and of the testimony elicited, the contention that no proper predicate was laid is overruled. Gauntt v. State, 169 Tex.Cr.R. 520, 335 S.W.2d 616, 619; Cook v. State, Tex.Cr.App., 388 S.W. 2d 707, 709.

From all of the testimony of the witness Miramontes, it is apparent that he was aware of the fact at the time that appellant, who he testified had a pistol and was beaten by the deceased, fired the shot he heard.

The next ground of error relates to the argument of counsel for the state which it is contended referred to appellant's failure to testify.

The remarks complained of and the objection thereto are as follows:

"We must base our case on circumstantial evidence if we do not have a confession, that is admissible made by the Defendant or if there is no eye witness who is willing to testify to what he saw. If we don't have that eye witness who will give testimony or a confession, then the State in every criminal case must depend on circumstantial evidence. So, you can see, of course, that the law realizes that they will not say just because a man won't tell you what he saw or just because the Defendant won't confess that we can't try him.

"MR. BARCLAY: If the Court please, I'm going to object to that line of argument. I believe he's commenting on the failure of the Defendant to testify.

"THE COURT: Overruled.

"MR. BARCLAY: Exception."

In his brief reference is made to the foregoing and to remarks objected to on other grounds or without stating any ground.

■ The complained of remarks above quoted were made in connection with the charge on circumstantial evidence and do not constitute a reference to the defendant's failure to testify in his own behalf.

Appellant's ground of error No. 4 relates to the failure of the trial court to give proper admonitory instructions or grant mistrial when counsel for the state argued that appellant carried a pistol and carried one into the cafe.

The remarks to which objection was addressed clearly reflect that counsel submitted as a reasonable deduction from the evidence that appellant had the pistol on him when he went in the cafe. We see no error.

The remaining claim of error relates to the denial of appellant's requested charge on self-defense.

■ The argument is advanced that appellant was entitled to his requested charge on self-defense against milder attack under Art. 1224, Vernon's Ann.P.C.

No objections to the court's charge appear in the record.

The question of whether self-defense against a milder attack may be raised by circumstantial evidence or was raised in this case by the testimony of Miramontes is not before us.

The record contains a request for a charge on self-defense against an attack giving rise to a reasonable expectation or fear of death or serious bodily harm, which was properly denied since the evidence did not raise the issue.

We find no bill of exception or request for a charge on self-defense against a lesser attack in the record.

The judgment is affirmed.

## DISSENTING OPINION

MORRISON, Judge.

Appellant's first and principal ground of error should be sustained. The officers had no arrest or search warrant. It is clear that appellant was under arrest. The following testimony by Officer Brown on cross examination was not set forth in the majority opinion:

"Q. I see, when you ascertained his name, was he free to leave?

A. No.

Q. So, all right, so during the time that you had this conversation with him pertaining to the gun, he was under arrest, is that correct?

A. Yes. After I found out his name."

This search cannot be justified under the rule announced by the Supreme Court of the United States in McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153, and Warden Md. Penitentiary v. Hayden, supra. In the case at bar four hours had elapsed from the time the officer began his investigation to the time of the arrest. In McDonald, supra, the Court said, "This guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike."

To hold as the majority does would authorize coercive type warrantless entry of any citizen's bedroom at four o'clock in the morning by a number of armed police officers seeking information. This is and always has been prohibited by our Constitution.

This cannot be a case of invitation or consent because the identity of the lady who admitted the officers was not shown. The officer could not recall who lived at the address where the search was made. There was no testimony indicating that appellant himself invited the officers in or consented to the search. He was alone in bed when four officers came and began to ask him questions. Under such circum-

stances, consent to search cannot be inferred or presumed. It cannot be said that appellant volunteered the information about the whereabouts of the pistol, because the officer said that "he didn't answer at first." Then, "I asked him again."

The proper rule, as I view it, has been enunciated by the Supreme Court of California in People v. Stockman, 63 Cal. 494, 47 Cal.Rptr. 365, 407 P.2d 277; People v. Charles, Cal., 57 Cal.Rptr. 745, 425 P.2d 545; and People v. Doherty, Cal., 59 Cal. Rptr. 857, 429 P.2d 177. It is that "the prosecution bears the burden of proving that the statement in question was not the fruit of a forbidden interrogation." People v. Charles, supra. It is conceded that no warning was given in the case at bar, and therefore, the interrogation was forbidden because the Miranda warning was not given.

I respectfully dissent.